**FILED**

**NOV 1 5 2022**

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

1   Ivonne Perez Montijo

2   1530 W Ave K8, # 123

3   Lancaster, CA 93534

4   Telephone: 818-419-2171

5   Email: ivonnepmontijo@aol.com

6   SSN: XX-XX-5448

7

8             UNITED STATES BANKRUPCY COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10              LOS ANGELES DIVISION

11

12   In re: Perez Montijo        ) Case No. 2:22-bk-15866-BR

13                          )

14           Debtor,       ) Chapter: 7

15                          )

16   Ivonne Perez Montijo,      )

17                          )

18          Plaintiff,      )

19   Vs,                         )

20                          )

21   United Stated Department of Education   )

22   and Aidvantage         )

23                          ) Adversary Proceeding

24          Defendants    )

25   _____)

26     **Debtor's Complaint to Determine Dischargeablity of**

27       **Student Loans Due to Undue Hardship**

28         **11 U.S.C. §523 (a) (8)**

Complaint

1

Debtor, Ivonne Perez Montijo ("Debtor") alleges as follows:

## NATURE OF THE ACTION

1. This is an adversary proceeding by which Debtor seeks a declaration that repayment of her student loans from the above-captioned defendants (collectively, "Defendants") in the amount of $93,159.25 **(Exhibit 1),** would be an undue hardship under Bankruptcy code § 532 (a) (8) and therefore, should not be exempted from discharge under § 523 of the Bankruptcy Code.

## JURISDICTION AND VENUE

2. On Oct 27, 2022, Debtor filed a voluntary petition in the Court for relief under Chapter 7 Bankruptcy Code.

3. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and § 157.

4. This is a core proceeding pursuant to 28 U.S.C. §157 (b) (2).

5. Venue is proper in this district pursuant to 28 U.S. C.  § 1409 (a).

## BACKGROUND

6. Debtor receive her Master of Arts degree in Religious Studies on May 11, 2011 From California State University Long Beach. **(Exhibit 2)**  She continued her education for personal enrichment at Long Beach City College and then at Antelope Valley College (AVC).   This put her school loans in deferment.  During her enrollment at AVC she received her Yoga Teacher Certification  May 30, 2017 **(Exhibit 3).**  She then continued to pursue a Digital Media Certification. She was 2 courses short of her certification when she became technically homeless in July 2019.

7. Debtor lost her rental home in July 2019 due to home being sold buy owner. Debtor

received a 60 day notice to quit the residence **(Exhibit 4).** She was not able to find a new rental in the given time and thus started a period of being technically homeless for 8 months.  Upon leaving the rental home sot her she spent 2 nights at a motel 6 in Palmdale and spent 2 nights sleeping in her car with her two dogs. She was taken in by a family member but the situation was tenuous at best given the hostility and mental/emotional abuse perpetrated by the spouse to her person and that o f her two dogs. This led to depression and suicidal thoughts. Thankfully her sister got her vouchers for the Motel 6 and when the situation got very abusive she could take her dogs with her to the Motel 6 for a respite from the situation.

7. In early January of 2020 Debtor decided to re-register with Central Casting, aka Gep Cencast LLC,  as she had done this work 20 years ago.to work as a Background Actor under the jurisdiction of the Screen Actors Guild (SAG).  On Jan 14, 2020 she interviewed to be a regular/core background actor on Ted Danson's new television show called, "Mr. Mayor". To be a core background actor means that you  are one of those actors who is called routinely to play the same background role for a TV series or movie. This means you have guaranteed work on the television show 3-5 days per week when  product ion is filming episodes.

8. Debtor also had a small entertainment company in which she subcontracted actors to work as costumed entertainers for children's birthday parties and holiday events. She also worked as a face painter in said company, dba The Party Artist. **(Exhibit 5).**

9. Debtor, having a new source of income was able to sign a lease on Feb 14, 2020 **(Exhibit 6)** for an apartment with her two dogs being accepted as her emotional support dogs **(Exhibit 7)**. I was moved into the apartment with my two dogs by the end of February. On Friday March 7, 2020 I received a call from Zebra Entertainment cancelling all jobs for that weekend and another call from Awesome Events. This was the first domino to hit in what  would become known as the Corona Virus Pandemic. On March 4, 2020 Gov. Newsom declared a state of emergency in California **(Exhibit 8)** thus shutting down my work as a background actor on the "Mr. Mayor" and as a face painter.

10. Production resumed on the "Mr. Mayor" on Nov 2, 2020 through Jan 15, 2021 under the return to work agreement titled, "COVID-19 RETURN TO WORK AGREEMENT

Complaint

3

WITH DGA, IATSE, SAG-AFTRA AND TEAMSTERS/BASIC CRAFTS **(Exhibit 9)**. The

protocol for background actors included being tested for Covid-19 prior to the work day,

testing the morning of the work day, remaining six feet apart and wearing a mask unless one

on set and the cameras were rolling.  There was also a Covid Manager and team to make

sure these rules were being followed. On Nov 5, 2021 OSHA formally issued it's covid-19

vaccine mandates for the workplace with 100 or more employees. See

https://www.osha.gov/news/newsreleases/national/11042021 **(Exhibit 10)**.This mandate was

implemented by Universal/NBC Studios who produce the "Mr. Mayor" and all the major

production studios.

     11.  August 26, 2021 I received and offer letter from Central Casting to return as Core

Background for Mr. Mayor tv show contingent on, *"This production is requiring all cast & crew*

*to be vaccinated against COVID-19 and to be considered for work you MUST FALL INTO*

*EITHER OF THE TWO FOLLOWING CATEGORIES: (1) fully vaccinated with the COVID-19*

*vaccine (Pfizer, Moderna, or Johnson & Johnson) or (2) have a disability or sincerely held*

*religious belief that prevents vaccination"* **(Exhibit 11)**.  I fell under category 2-religious

exemption.

     12. August 30, 2021 I was put on First Avail for Mr Mayor with information on

covid testing on Friday Sept 3, 2021 **(Exhibit 12)**. We were not informed by Central Casting aka

Gep Cencast, LLC that we had to  apply for religious exemption through NBC/ Universal

Studios. I found this out when I went to backlot at NBC/Universal to covid test per the return

work agreement please see again **(Exhibit 8).**  I then received an email from Katie Wright, the

covid manger for Season 2 of the Mr. Mayor show with a new date to covid test **(Exhibit 13)**. I

assumed the issues had been resolved and showed up to test. My name was not on the gate so I

called Ms. Wright.  She said I needed to send my religious exemption forms to

USGAccommodationsWestCoast@nbcuni.com. Because I missed the covid test I was released

from the show by Central Casting **(Exhibit 14)**.  Sept 13, 2021 I was finally contacted by

Randeep Shergill, Director, HR & Employee Relations | Universal Studio Group **(Exhibit**

**15)** that I needed to fill out NBC/Universal Forms. Said forms were completed and emailed to

Randeep Shergill on Sept 14, 2021 **(Exhibit 16)**. A week later I received notice that my

Religious Exemption request had been denied **(Exhibit 17)**. I emailed back and asked why I was

denied and was thus informed via email **(Exhibit 18)**, *"Hello, As part of our interactive*

*process, we evaluated your request for an accommodation including the information and*

*documentation you submitted. After reviewing, we determined that we could not grant your*

*request in light of a number of considerations, including those related to maintaining a safe and*

*healthy workplace. I know this is disappointing, but as previously stated, please know that you*

*are not precluded from working on this production once there is no vaccine mandate or on other*

*NBC/Universal productions.* I did not understand this denial given that the return to work

protocols were still in effect: covid-testing the morning of a work date, social distancing, and the

wearing of a mask unless on set and the cameras are rolling.

13. Even though the Supreme Court on January 13, 2022, in the *National Federation of*

*Independent Business v. Department of Labor* **(Exhibit 19)** found that the Biden

administration's vaccine-or-testing mandate for large employers was not lawful it is still being

enforced by the Screen Actors Guild **(Exhibit20)** and Central Casting **(Exhibit 21).** Since being

released from the Mr. Mayor tv show I have only booked 2 work dates with Central Casting,

Dream Season 2 & Young Sheldon and 24 days as a face painter **(Exhibit 22)**. This situation

has cause lots of anxiety and stress as Debtor does not want to relive the experience of being

homeless.

14. The Debtor provides this background to give context to the current financial situation

she is in. Her financial struggles and ability to procure work and have a home are intertwined

with the Covid-19 mandates in the state of California and are exasperated by the burden of her

student loan.

## FACTUAL ALLEGATIONS

15. It is the Debtor's understanding that the Court often refers to either the Brunner Test

(Brunner vs. N.Y. State Higher Educ.Servs. Corp.,831 F.2d 395,396 (2d Cir. 1987), the Totality

f Circumstances Test (Eighth Circuit Court), or a combination of the two to determine if undue

## THE BRUNNER TEST

Complaint

5

1. The Debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the student loans.

2. Additional circumstances exist indicating that the hardship is likely to persist for a significant portion of the repayment of the student loans.

3. The Debtor has made good faith efforts to repay the loans.

**"THE DEBTOR CANNOT MAINTAIN, BASED ON CURRENT INCOME AND EXPENSES, A MINIMAL STANDARD OF LIVING FOR HERSELF AND HER  IF FORCED TO REPAY THE STUDENT LOAN"**

16. The Federal Poverty Guidelines for a single adult person is **$13,590.00** a year **(Exhibit 23)** however a "minimal standard of living" does not necessarily imply a life lived below or near that poverty line.  The Court in Ivory v. U.S. Dep't of Educ. (In re Ivory), 269 B.R. 890 (N.D. Ala. 2001) provides a useful guideline for defining a "minimal standard of living".  It states:

1. "People need shelter, shelter that must be furnished, maintained, kept clean and free of pests. In most climates it must also be heated and cooled.

2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer.  They need telephones to communicate.

3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items are dirty. They need the ability to replace them when they are worn.

4. People need vehicles to go to work, to go to stores and to go to doctors. They must have insurance for and the ability to buy vehicles.  They must pay for gasoline.  They must have the ability to pay for routine maintenance such as oil changes and tire replacement and they must be able to pay for unexpected repairs.

Complaint

5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

6. People must have the ability to pay for some small diversion or source of recreation, even if it just watching television or keeping a pet."

17. Given that the Debtor lives in Lancaster a city in Los Angeles County, CA and is subjected to a much higher cost of living than most other cities in the United States, she's supplied a report from the State of California Department of Housing and Community Development Division of Housing Policy Development that categorizes income levels in California counties under the guideline of the Federal Department of Housing and Urban Development (HUD) **(Exhibit 24)**. HUD uses the median income in different California Counties to establish an income baseline to determine eligibility for various subsidized housing programs. Their chart indicates that as of May 2022 the Area Median Income for Los Angeles county was $ 91,000.00. In 2021, the Debtor had an AGI of $10,195.00 **(Exhibit 24) and (Exhibit 44)** which falls between the categories of "Acutely Low" ($9550.00) and "Extremely Low" ( $25050.00). She uses this report only to give context to the phrase "minimal standard of living" as it applies to housing in the Los Angeles County by the State of California.

18. The Debtor is currently unemployed as the result of Covid 19 layoffs, shutdowns and mandates. She was receiving California State Unemployment in the amount of $98.00 however she has received all benefits payable at this time **(Exhibit 25)**.She is not able to file a new claim until April 3, 2023 and because she has only been able to work 2 jobs under the Screen Actors Guild through Gep Cencast, LLC she has not made enough income to qualify for a new claim in 2023 and thus will have no back up income. The Debtors reduced income and work opportunities has qualified her for food stamps in the amount of $250.00 a month **(Exhibit 26)**. Her low income also qualifies her for Medi-Cal through California Care **(Exhibit 27)**. Debtor also received two grants in 2021 which helped her to pay her rent; $3195.00 through the CA COVID-19 RENT RELIEF **(Exhibit 28)** and $5000.00 grant through California Relief Grant Program **(Exhibit 29)**.

# CURRENT INCOME

-There is no guaranteed source of regular income at this time.

# ADDITIONAL FINANCIAL SUPPORT

-$250.00 Food Stamp Benefit/ State of California  see again **(Exhibit 26)**

- Fully subsidized medical insurance provided through Medi-Cal/California

Care see again **(Exhibit 27).**

19. The Debtor has used her net income after deductions for the 2021 tax year of

$10,15.00 to illustrate the burden that her Federal Student Loans create for her in a "normal"

economy. In 2021 she was still working as a background actor on The Mayor Show and various

other productions was receiving $245.00 weekly in unemployment, and was working as a face

painter and still had 2 subcontracted performers working with her **(Exhibit 30).**  The work

and income opportunities have been far less and also unemployment benefits were reduced.

# CURRENT EXPENSES

-$1075.00 monthly **APARTMENT RENT**

-$12.67 monthly **RENTERS INSURANCE**-Liberty Mutual

-$111.99 monthly **AUTO INSURANCE**-GEICO

-$400.00 monthly **GAS & AUTO RELATED COSTS** (approximately)

-$144.00 monthly **STORAGE UNIT** costumes and work related equipment

-$79.08 monthly **UNTILITES**-GAS/ELECTRIC (average)

-$12.00 monthly **BODYWORKS INSURANCE** for face painting.

-$500.00 monthly **FOOD & HOUSEKEEPING SUPPLIES** (approximately)

-$6.99 monthly **INTERNET**- AOL

-25.83 monthly **UNION DUES**-Screen Actors Guild (average)

-$237.33 monthly **DOG FOOD & CARE** (average)

-$40.00 monthly **CLOTHING & PERSONAL CARE PRODUCTS**

-$50.00 monthly **FACE PAINTING SUPPLIES**

= **$2,694.87** per month - **$32,338.44** per year

20. The Debtor pays $1075.00 in monthly APARTMENT RENT **(Exhibit 31).** She lives in a small 620 sq ft one bedroom apt because it allowed her to have her two dogs. The debtor is on a yearly lease because of her Bankruptcy and it's existence on her credit report-finding a new apartment would be both challenging and limited, she has two emotional support dogs which is also limiting in the apartmental rental world. Her biggest fear is becoming homeless again which has made paying her rent the number 1 priority.

21. The Debtor has allotted $400 monthly for gas and auto. In 2016 the cost of gas at Costco was $2.79 a gallon, currently the price is $5.05 a galloon. Living in Lancaster she drive anywhere from 1-2 hours to get to job locations. She drives a 2005 Toyota Rav 4 with 280,000 because it has proven to be reliable  and keeps her from having to pay an auto loan. Repairs and maintenance are thus less expensive than a loan for a newer car.

22. The Debtor has an 1phone 8 while the most recent model is iphone 14 and thus has no monthly expensive for a phone and is currently on her mother's family cell phone plan since she has lost the house she was renting in July of 2019.

23.The Debtor has allotted approximately $450.00 per month for food of the  food and cleaning expenses. The Debtor sticks to a strict vegan diet for both health and ethical  reasons. After 3 trips to the E.R. for Asthma and almost dying and being put on steroid pills, nebulizer breathing treatment 3X a day in addition to inhales she started  to  research holistic ways to improve Asthma. Studies support the removal of dairy  products and increasing fruits and vegetables contribute to the management of Asthma. **(Exhibit 32).**

24. The Debtor has allotted $273.00 monthly for DOG FOOD & CARE.  She has two senior dogs (both 10 years old) who have lived with her the entirety of their lives and she considers them as family.  The Debtor has no husband or boyfriend or children and thus all she has for emotional support are her two dogs.  They are what keep her depression and suicidal

thoughts under control see again **(Exhibit 7).** As an ethical vegan she feeds them vegan dog and is consciousness to thusly feed them high quality food to make sure they receive all the nutrients and vitamins a dog need to thrive on a plant-based diet.

25. The Debtor has averaged her costs for UTILITIES by taking all of her bills with So Cal Gas and Southern California Edison for the past year and dividing by 12 to come up with an approximately monthly expense of $79.08 a month. I am currently enrolled in the *California Alternate Rates for Energy (CARE)* which gives me a discounted rate based on my income **(Exhibit 33).**

## SUMMARY

26. The Debtor has catalogued her expenses based on what has occurred in the year 2022. If you calculate her overall yearly cost based on the budget above you would get roughly $32,338.44 per year- while her income for the year of 2021 after business deductions was $10,195.00 or $849.58 a month, well over $1845.29 a month than what she made in 2021. The difference was financed with covid grants, covid loans, and food stamps which has clearly resulted in financial devastation.

## "ADDITIONAL CIRCUMSTANCES INDICATING THAT THE HARDSHIP IS LIKELY TO PERSIST FOR A SIGNIFICANT PORTION OF THE REPAYMENT PERIOD OF THE STUDENT LOAN."

## COVID-19

27. The California Covid-19 mandates are what created the climate which led the Debtor to financial crisis. These mandates continue to be in effect until February 2023—four months down the line. Who can predict what is going to happen between now and for months. The Debtor goes out to go grocery shopping and see store clerks and consumers alike still wearing

masks and living in fear of THE VIRUS.  It is this fear which drives the Debtors ability to procure work.  The next phase of the California Department of Public Health (CDPH) is the California Smarter Plan which goes into effect in February 2023.  This plan continues to promote vaccines and the wearing of mask **(Exhibit 34).**

28. In a Constitutional Republic this should be voluntary and not mandatory, and a religious exemption should be honored, however as I have already demonstrated the television and motion picture industry in the state of California is not honoring Religious Exemption for background workers. Gep Cencast, LLC aka Central Casting is still promoting vaccines and booster shots. There is no update to indicate that this will change in February of 2023 (Exhibit 29). On October 26, 2022 the Screen Actors Guild aka *SAG-AFTRA, the DGA, IATSE, Teamsters and the Hollywood Basic Crafts Announce Extension to Covid-19 Safety Agreement,* through January 31, 2023 **please see again (Exhibit 20).**

Key in this announcement are the following statements:

> "The new agreement requires the strictest protocols be implemented
> on productions occurring in any metropolitan area or county with 14
> or more COVID-19 hospital admissions per 100,000 population. This
>
> is a reasonable and appropriate modification in the trigger given the current
> environment.
>
> The agreement also gives productions the option of a daily antigen testing regime
> for Zone A during a surge in which the production reverts back to the more
> stringent Part 1 mandatory protocols.
>
> **Importantly, employers retain the right to adopt more stringent**
> **requirements regarding masking and testing on a production-by-production**
> **basis and to mandate that employees in Zone A be "up-to-date" on their**
> **vaccinations.**
>
> Other than these modifications, all other provisions remain in full force and effect.

Complaint

1  **In all cases, the full set of stricter protocols will be reintroduced if there is a**

2  **COVID-19 surge over the winter."**

3

4  These last two sentences are very important because they indicate it is at the producers

5  discretion, regardless of what State or Federal mandates are to implement stricter protocols than

6  what is already outlined in the Return to Work Agreement see again **(Exhibit 9)**.  Again even

7  though, the Supreme Court on January 13, 2022, in the *National Federation of Independent*

8  *Business v. Department of Labor*  please see again **(Exhibit 19 )** found that the Biden

9  administration's vaccine-or-testing mandate for large employers was not lawful it is still being

10  enforced by the Screen Actors Guild please see again **(Exhibit 20)** and Central Casting **(Exhibit**

11  **21)**.  This creates an environment of uncertainly

12  in which the Debtor has no confidence in her ability to be able to return to work as a background

13  actor.  Approaching the age of 61 what opportunities are there for obtaining work outside of her

14  field of talent and abilities? The minimum wage starting January 1 2023 **(Exhibit 35)** will be

15  $15.50 an hour.  $15.50 an hour times 40 hours a week is $620.00 a week times 4 weeks is

16  $2,480.00 a month minus 30% ( $744.00) for taxes leaves $1736.00 a month take home, which is

17  $20, 832.00 yearly and falls in between the categories of acutely low and extremely low income

18  for Los Angeles County **(Exhibit 24)**.  $1736.00 a month in wages still leave her short $958.87

19  month.  While working as a background actor is not guaranteed nor is face painting work

20  guaranteed prior to Covid-19 in 2020 Debtor was able to meet her expenses.

21

22  **SUMMARY**

23

24  29. It is hard to imagine the burden and stress created by outside circumstances such as a

25  global pandemic which curbs one's ability to be able to work and produce income.

26  It is hard to imagine the fear of being homeless unless one has had the experience.  These are the

27  two factors at work in the life of the Debtor against the backdrop of Covid-19.  The desire and

28  ability to work are  present what prevents Debtor from being able to do so are those

Complaint

circumstances beyond her control such as legislation and mandates that prevent her from being hired. If the religious exemption had been honored as stated this financial crisis would not exist.

### "THE DEBTOR HAS MADE A GOOD-FAITH EFFORT TO REPAY THE LOANS"

30. The Debtor has always struggled to make her student loan payments. Despite whatever financial circumstances she has been in she has attempted to keep her account in good standing. She has utilized forbearances, deferments and payments **(Exhibit 36).** Currently the student loans

are under the National Emergency Forbearance – One or more of your loans have been granted a forbearance in accordance with the Presidential Memorandum extending student loan relief offered under the CARES Act in response to the COVID-19 pandemic **(Exhibit 37).** Debtor applied for Federal Loan Debt relief provided U.S. Department of Education (ED) as part of the Biden-Harris Administration student debt relief plan. although at this time the program is paused due to court order **(Exhibit 38)**. At best the loans may be discharged at worst I could receive a a relief of $10,000 which would leave a balance of $82,387.65 and loan payments around $800.00 a month. Moving forward Debtor does not even know how she is going to be able to pay her rent and living expenses let alone an additional $800.00 a month. Approaching 61 years of age Debtor is not even sure she will live long enough to be able to pay off the student loan.

### THE TOTALITY OF CIRCUMSTANCES TEST

1. The debtor's past, current, and reasonably reliable future financial resources.
2. The debtor's reasonable necessary living expenses.

3. Any other relevant facts and circumstances applicable to the bankruptcy case.

## "THE DEBTOR'S PAST, CURRENT, AND RESONABLY RELIABLE FUTURE FINANCIAL SOURCES."

### PAST FINANCIAL SOURCES

31. This is a report from the Social Security Administration (SSA) detailing a historical account of the Debtor's earnings from 1977-2021 **(Exhibit 39)**.  It shows that the highest amount that she has earned in taxable income was $15,302.00 in 1986.

## CURRENT FINANCIAL SOURCES

32. This has been established and documented through evidence submitted for the Brunner Test in this complaint.

## RELIABLE FUTURE FINANCIAL SOURCES

33. The Debtor has paid her dues to the Screen Actors Guild denoting that she is available to accept work as a background actor under the jurisdiction of the guild **(Exhibit 40).** Debtor is still registered with Gep Cencast, LLC AKA Central Casting as being available to work .attached is the most recent work **offer  (Exhibit 41),** which I accept with Religious Exemption but  have not heard back from them—this is the pattern that has been occurring for the past year. Future work is tenuous at best.

### "THE DEBTOR'S REASONABLE NECESSARY LIVING EXPENSES."

Complaint

14

34. This has been established and documented through evidence submitted for the Brunner Test in this complaint.

### "ANY OTHER RELEVANT FACTS AND CIRCUMSTANCES APPLICABLE TO THE BANKRUPTCY CASE."

35. This has been established and documented through evidence submitted for the Brunner test in this complaint.

## CONCLUSION

36.  The Debtor can't really speak to her future ability to earn because her ability to earn money is tied into the Covid-19 situation and the mandates, although unconstitutional put in place by the state and by the Motion Picture and television Industry, The Screen Actors Guild and Central Casting.  This reality undoubtedly will affect her ability to earn in the future.

37. What happens when the forbearances and deferments run out? They are scheduled to end on Jan 1, 2023. I have applied for debt relief through the Federal program but what happens if I am denied? As it is the program is on pause due to a court order **(Exhibit 42).** What happens if I only get $10,000.00 forgiven? That still leaves a balance of $92,387.65 with payments of around $800.00 monthly. Debtor does not even know how she is going to pay the rent and her living expenses let alone an additional payment of $800.00 a month **(Exhibit 43).**

38. With that in mind- how will a default affect the Debor's credit and her ability to maintain and secure housing? What happens the next time she is put into a position where she has to chose between paying her rent in full or making her student loan payment? Having experienced being technically homeless this is not an option she wants to experience again.

39. The debtor has supplied evidence of her past earnings and realistic expectations for her immediate future earnings.  She is hoping that the covid-19 emergency will end and can resume to earn a living.

Complaint

15

40. Having a Federal Student Loan Payment has always placed a financial and emotional burden on her. She had hoped by educating herself and getting her Graduate Degree would increase her ability to earn a living wage.

**WHEREFORE,** the Debtor requests judgment as follows:

1. A declaration that repaying Debtor's student loans from defendants would constitute an undue hardship within the meaning of the 11 U.S.C. § 523 (a) (8).

2. A declaration that the Debtor's student loans from Defendants are not exempted from discharge and in included in Debtor's discharge under Chapter 7 of the Bankruptcy Code.

3. For such other and further relief as the Court deems just and proper.

Dated November 11, 2022                              /s/ Ivonne Perez Montijo
                                                     Debtor, in Propria Persona

Aidvantage | Account Summary                                     https://myaccount.aidvantage.com/AccountSummary/Index



☰            ›                    **aidVantage**                    ⟶ Log Out

---

Total Payment Due:                                    $0.00

 ⓘ

⚓ National Emergency Forbearance – One or more of your loans have been granted a forbearance in accordance with the Presidential Memorandum extending
student loan relief offered under the CARES Act in response to the COVID-19 pandemic.

During this forbearance, you can still make payments, no interest will accrue, and your progress toward loan forgiveness or voluntary forbearance won't be
affected. Learn more →

If you want, you can opt out of this forbearance, put your loans back into repayment, and resume monthly payments.

Visit our COVID-19 Student Loan Support Center to get the latest information on payment relief.

ⓘ   **IDR Renewal** – Your Income-Driven Repayment plan is due to expire on 9/16/2016. Recertify now, or recalculate if your income has changed. Plus, income
documentation is currently not required.

## Your Loans ⓘ

| Loan ▾ | Due Date ▾ | Amount ⓘ ▾ |
|---|---|---|
| ⊕ 1-01 DL Consolidated - Subsidized | 11/16/2022 | $0.00 |
| ⊕ 1-02 DL Consolidated - Unsubsidized | 11/16/2022 | $0.00 |
| ⊕ 1-03 DL Consolidated - Subsidized | 11/16/2022 | $0.00 |
| ⊕ 1-04 DL Consolidated - Unsubsidized | 11/16/2022 | $0.00 |
| ⊕ 1-05 DL Consolidated - Subsidized | 11/16/2022 | $0.00 |
| ⊕ 1-06 DL Consolidated - Subsidized | 11/16/2022 | $0.00 |
| ⊕ 1-07 Direct Loan - Subsidized | 11/16/2022 | $0.00 |
| ⊕ 1-08 Direct Loan - Subsidized | 11/16/2022 | $0.00 |
| ⊕ 1-09 Direct Loan - Unsubsidized | 11/16/2022 | $0.00 |
| ⊕ 1-10 Direct Loan - Unsubsidized | 11/16/2022 | $0.00 |

Total Current Balance: **$92,387.65**

Total Number of Loans: **10**

View all Loan Details →

Please note: This is an attempt to collect a debt and any information obtained will be used for that purpose.

## Recent Payments ⓘ

| Date ▾ | Amount ▾ | Status ▾ | |
|---|---|---|---|
| ⊕ 10/14/2022 | $25.00 | Received | -- |
| ⊕ 09/15/2022 | $25.00 | Received | -- |
| ⊕ 08/15/2022 | $25.00 | Received | -- |
| ⊕ 07/15/2022 | $25.00 | Received | -- |
| ⊕ 06/15/2022 | $25.00 | Received | -- |

View all Account History →

# California State University, Long Beach

The Trustees of the California State University
on recommendation of the faculty have conferred upon

## Ivonne Perez Montijo

the degree of

## Master of Arts

in

## Religious Studies

with all rights, privileges and honors thereunto appertaining.

Given at California State University, Long Beach, this
twenty-seventh day of May, in the year twenty eleven.

Edmund G. Brown J.
Governor
President of the Board of Trustees

Charles B. Reed
Chancellor
The California State University

Chair
Board of Trustees

F. King Alexander
President
California State University, Long Beach



00227225.WPD; 3

19

**EXHIBIT 3**



**ANTELOPE VALLEY COLLEGE**

# CERTIFICATE OF ACHIEVEMENT: YOGA INSTRU

This certificate certifies that

# IVONNE PEREZ MOI

has successfully completed the 12 units of required course

Yoga Instructor Certificate Program at Antelope Valley

# MAY 30, 2017



The program is designed to meet the standard
by Yoga Alliance for the 200 hour level and cor
may register with Yoga Alliance at the RYT 200

*Dr Bonnie Suderman*
Dr. Bonnie Suderman
Vice President | Academic Affairs

Kathy Bingham, MA, E-
Professor | Kinesio



# 60- Day Notice to Move Out

### (Pursuant to California Civil Code Section 1946)

To: Ivonne Montijo _____, Resident(s)

**AND ALL OTHERS IN POSSESSION. PLEASE TAKE NOTICE** that your tenancy

and rental agreement under which you occupy the premises located at

37064 Springfield St, Palmdale, CA 93552 _____, are hereby terminated

sixty (60) days after service upon you of this notice or as of _____July 18th, 2019 ,

whichever is later.

**YOU ARE HEREBY REQUIRED** to vacate and move your belongings by the above

stated time period.

**THIS NOTICE**, under the provisions of Section 1946 of the California Civil Code,

requires no specified reason.

**YOUR FAILURE TO VACATE** within the said time period will result in local

proceedings against you to recover possession of the subject premises, attorney fees,

court costs and penalty damages of $600.00 under Section 1174 as provided by California

Code of Civil Procedure.

This Notice was personally served or posted and mailed by the Landlord at the following

time: (Date/Time) May 17th , 20 19 . 4:32pm

Owner(s): Lake Place Homes, LLC _____ By: Erick Huizar _____ Agent

If you have any questions, please don't hesitate to call.

Owner/Agent: Erick Huizar _____

Phone: 661-368-6382 _____

ehuizar@havenrc.com

**EXHIBIT 4**

# CITY OF LANCASTER
## BUSINESS LICENSE CERTIFICATE
*"For Services Provided in the City of Lancaster, California Only"*



**Business Name**      THE PARTY ARTIST

**Business Location**      1530 W Avenue K8 # 123
Lancaster, Ca 93534-6312

**Business Owner(s)**      IVONNE PEREZ MONTIJO

**Business License Number**      07720282

**Effective Date**      Feb 1 2020

**Expiration Date**      Jan 31 2021

**Description**      FACE PAINTER AND KIDS COSTUME ENTERTAINMENT*NO CUS

THE PARTY ARTIST
1530 W AVENUE K8 # 123
LANCASTER, CA 93534-6312

This certificate signifies that the person named on the face hereof has fulfilled the requirement of Title 5 of the Lancaster Municipal Code by obtaining a business license and paying the required fees. It does not entitle the licensee to transact any business unless the licensee has complied with all requirements of this chapter and any other applicable federal, state or local regulations pertaining to such business including, but not limited to, all applicable provisions of this Code. This certificate does not constitute, imply possession of or represent any other federal, state, or local permit, certificate or license required to conduct this business. This license may be suspended or revoked or conditioned with cause, per Title 5.

This License becomes void if any of the information on this license changes. License is not transferable or assignable. License must be posted for inspection by public.

**EXHIBIT 5**

# LEASE CONTRACT



Date of Lease Contract: ___February 14, 2020___
(when the Lease Contract is filled out)

*This is a binding document. Read carefully before signing.*

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between you, the resident(s) *(list all people signing the Lease Contract):*

Ivonne Montijo

and us, the owner: Cedar Creek LP

_____ *(name of title holder or published and recorded fictitious business name).* You've agreed to rent Unit No. ___102___ at ___1530 West Avenue K-8___

*(street address)* in ___Lancaster___
*(city),* California, ___93534___ *(zip code)* (the "Dwelling") for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

**2. OCCUPANTS.** The dwelling will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

No one else may occupy the dwelling. Persons not listed above must not stay in the dwelling for more than ___14___ consecutive days without our prior written consent, and no more than twice that many days in any one month. If the previous space isn't filled in, two days per month is the limit.

**3. LEASE TERM.** The initial term of the Lease Contract begins on the ___14th___ day of ___February___ 2020 , and ends at 11:59 p.m. the ___31st___ day of ___January___ ___2021___. THIS LEASE CONTRACT WILL AUTOMATICALLY RENEW MONTH-TO-MONTH UNLESS EITHER PARTY GIVES AT LEAST ___30___ DAYS WRITTEN NOTICE OF TERMINATION OR INTENT TO MOVE-OUT AS REQUIRED BY PARAGRAPH 48 (MOVE-OUT NOTICE). If the number of days isn't filled in, at least 30 days written notice is required. If the Residents have been in possession for longer than one year, Landlord shall provide Residents with at least a 60 day written notice to terminate tenancy. Residents shall comply with all notice provisions in paragraph 32 (Default by Resident).

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the dwelling is $___325.00___, due on or before the date this Lease Contract is signed. See paragraphs 52 (Security Deposit Deductions and Other Charges) and 53 (Deposit Return, Surrender, and Abandonment) for security deposit return

information. The security deposit may not exceed 2 month's rent for an unfurnished dwelling, and 3 month's rent for a furnished dwelling. The security deposit may not exceed two and a half month's rent for an unfurnished dwelling, and three and a half month's rent for a furnished dwelling in the event you install water furniture.

**5. KEYS.** You will be provided ___1___ Dwelling key(s), ___1___ mailbox key(s), ___1___ FOB(s), and/or ___1___ other access device(s) for access to the building and amenities at no additional cost at move-in. If the key, FOB, or other access device is lost or becomes damaged during your tenancy or is not returned or is returned damaged when you move out, you will be responsible for the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $___1125.00___ per month for rent, payable in advance and without demand:
☒ at the on-site manager's office, or
☐ at our online payment site, or
☐ at _____

Prorated rent of $___620.69___ is due for the remainder of *(check one):* ☒ 1st month or ☐ 2nd month, on

Otherwise, you must pay your rent on or before the ___3rd___ day of each month *(due date)* with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted, if the payment/ACH is rejected, does not clear, or is stopped for any reason. If you don't pay all rent on or before the expiration of one business day after the due date, you'll be delinquent. You will be obligated to pay to us *(check one):* ☐ a flat rate of $___75.00___ or ☐ _____ % of your total monthly rent payment if you fail to pay any amount when due under this Contract. You agree that it would be impracticable or extremely difficult to fix the actual damage to us and that the late charge is a reasonable estimate of the actual damages that the parties reasonably believe would occur as a result of late payment. You'll also pay a charge of $25.00 for each returned check or rejected electronic payment. For additional returned checks you'll pay a charge of $35.00. If you are delinquent, all remedies under this Lease Contract will be authorized. If you are delinquent, all remedies under this Lease Contract and California law will be authorized. A negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill your credit obligations under this Lease. All payment obligations under this Lease Contract shall constitute rent under this Lease Contract.

☐ **Rent Concession.** If this box is checked, you and we have entered into an Addendum for a Rent Concession. The Addendum is attached. Please read it thoroughly.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ water;   ☐ gas;   ☐ electricity;   ☐ master antenna
☐ wastewater;   ☐ trash;   ☐ cable TV;
☐ other _____

You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the Lease Contract term. If the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-powered lighting. If any utilities are submetered for the dwelling unit, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance.

© 2020, National Apartment Association, Inc. - 2/2020, California

Page 1 of 8

**Lakeside**
**Community Healthcare™**

12660 Riverside Dr Suite 320
North Hollywood, CA 91607-3431
P: (818) 755-0391 (Phone) F: (818)753-8165

01/22/2020

IVONNE PEREZ MONTIJO
16709 McKeever St
Granada Hills, Ca. 91344

To Whom it may concern,

Ivonne Perez Montijo is my patient, and has been under my care since Oct.7, 2019. I am intimately familiar with her history and with the functional limitations imposed by her disability. She meets the definition of disability under the Americans with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act of 1973.

Due to mental illness, Ivonne has certain limitations regarding coping with depression and stress. In order to help alleviate these difficulties, and to enhance her ability to live independently and to fully use and enjoy the dwelling unit you own and/or administer, I am prescribing an emotional support animals (Maddy & Marly) that will assist Ivonne in coping her disability.

Upon request, I would be happy to answer questions you may have concerning my recommendation that Ivonne Perez Montijo have an emotional support animal.

If you have any additional questions please contact my office.

Sincerely,

Eileen E. Watrous MD

00227225.WPD; 3                                    23                                    **EXHIBIT 7**

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

**PROCLAMATION OF A STATE OF EMERGENCY**

**WHEREAS** in December 2019, an outbreak of respiratory illness due to a novel coronavirus (a disease now known as COVID-19), was first identified in Wuhan City, Hubei Province, China, and has spread outside of China, impacting more than 75 countries, including the United States; and

**WHEREAS** the State of California has been working in close collaboration with the national Centers for Disease Control and Prevention (CDC), with the United States Health and Human Services Agency, and with local health departments since December 2019 to monitor and plan for the potential spread of COVID-19 to the United States; and

**WHEREAS** on January 23, 2020, the CDC activated its Emergency Response System to provide ongoing support for the response to COVID-19 across the country; and

**WHEREAS** on January 24, 2020, the California Department of Public Health activated its Medical and Health Coordination Center and on March 2, 2020, the Office of Emergency Services activated the State Operations Center to support and guide state and local actions to preserve public health; and

**WHEREAS** the California Department of Public Health has been in regular communication with hospitals, clinics and other health providers and has provided guidance to health facilities and providers regarding COVID-19; and

**WHEREAS** as of March 4, 2020, across the globe, there are more than 94,000 confirmed cases of COVID-19, tragically resulting in more than 3,000 deaths worldwide; and

**WHEREAS** as of March 4, 2020, there are 129 confirmed cases of COVID-19 in the United States, including 53 in California, and more than 9,400 Californians across 49 counties are in home monitoring based on possible travel-based exposure to the virus, and officials expect the number of cases in California, the United States, and worldwide to increase; and

**WHEREAS** for more than a decade California has had a robust pandemic influenza plan, supported local governments in the development of local plans, and required that state and local plans be regularly updated and exercised; and

**WHEREAS** California has a strong federal, state and local public health and health care delivery system that has effectively responded to prior events including the H1N1 influenza virus in 2009, and most recently Ebola; and

**page 1 of 5**

**WHEREAS** experts anticipate that while a high percentage of individuals affected by COVID-19 will experience mild flu-like symptoms, some will have more serious symptoms and require hospitalization, particularly individuals who are elderly or already have underlying chronic health conditions; and

**WHEREAS** it is imperative to prepare for and respond to suspected or confirmed COVID-19 cases in California, to implement measures to mitigate the spread of COVID-19, and to prepare to respond to an increasing number of individuals requiring medical care and hospitalization; and

**WHEREAS** if COVID-19 spreads in California at a rate comparable to the rate of spread in other countries, the number of persons requiring medical care may exceed locally available resources, and controlling outbreaks minimizes the risk to the public, maintains the health and safety of the people of California, and limits the spread of infection in our communities and within the healthcare delivery system; and

**WHEREAS** personal protective equipment (PPE) is not necessary for use by the general population but appropriate PPE is one of the most effective ways to preserve and protect California's healthcare workforce at this critical time and to prevent the spread of COVID-19 broadly; and

**WHEREAS** state and local health departments must use all available preventative measures to combat the spread of COVID-19, which will require access to services, personnel, equipment, facilities, and other resources, potentially including resources beyond those currently available, to prepare for and respond to any potential cases and the spread of the virus; and

**WHEREAS** I find that conditions of Government Code section 8558(b), relating to the declaration of a State of Emergency, have been met; and

**WHEREAS** I find that the conditions caused by COVID-19 are likely to require the combined forces of a mutual aid region or regions to appropriately respond; and

**WHEREAS** under the provisions of Government Code section 8625(c), I find that local authority is inadequate to cope with the threat posed by COVID-19; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes, including the California Emergency Services Act, and in particular, Government Code section 8625, **HEREBY PROCLAIM A STATE OF EMERGENCY** to exist in California.



**page 2 of 5**

**IT IS HEREBY ORDERED THAT:**

1. In preparing for and responding to COVID-19, all agencies of the state government use and employ state personnel, equipment, and facilities or perform any and all activities consistent with the direction of the Office of Emergency Services and the State Emergency Plan, as well as the California Department of Public Health and the Emergency Medical Services Authority. Also, all residents are to heed the advice of emergency officials with regard to this emergency in order to protect their safety.

2. As necessary to assist local governments and for the protection of public health, state agencies shall enter into contracts to arrange for the procurement of materials, goods, and services needed to assist in preparing for, containing, responding to, mitigating the effects of, and recovering from the spread of COVID-19. Applicable provisions of the Government Code and the Public Contract Code, including but not limited to travel, advertising, and competitive bidding requirements, are suspended to the extent necessary to address the effects of COVID-19.

3. Any out-of-state personnel, including, but not limited to, medical personnel, entering California to assist in preparing for, responding to, mitigating the effects of, and recovering from COVID-19 shall be permitted to provide services in the same manner as prescribed in Government Code section 179.5, with respect to licensing and certification. Permission for any such individual rendering service is subject to the approval of the Director of the Emergency Medical Services Authority for medical personnel and the Director of the Office of Emergency Services for non-medical personnel and shall be in effect for a period of time not to exceed the duration of this emergency.

4. The time limitation set forth in Penal Code section 396, subdivision (b), prohibiting price gouging in time of emergency is hereby waived as it relates to emergency supplies and medical supplies. These price gouging protections shall be in effect through September 4, 2020.

5. Any state-owned properties that the Office of Emergency Services determines are suitable for use to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services for this purpose, notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

6. Any fairgrounds that the Office of Emergency Services determines are suitable to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services pursuant to the Emergency Services Act, Government Code section 8589. The Office of Emergency Services shall notify the fairgrounds of the intended use and can immediately use the fairgrounds without the fairground board of directors' approval, and

**page 3 of 5**

**EXHIBIT 8**

notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

7. The 30-day time period in Health and Safety Code section 101080, within which a local governing authority must renew a local health emergency, is hereby waived for the duration of this statewide emergency. Any such local health emergency will remain in effect until each local governing authority terminates its respective local health emergency.

8. The 60-day time period in Government Code section 8630, within which local government authorities must renew a local emergency, is hereby waived for the duration of this statewide emergency. Any local emergency proclaimed will remain in effect until each local governing authority terminates its respective local emergency.

9. The Office of Emergency Services shall provide assistance to local governments that have demonstrated extraordinary or disproportionate impacts from COVID-19, if appropriate and necessary, under the authority of the California Disaster Assistance Act, Government Code section 8680 et seq., and California Code of Regulations, Title 19, section 2900 et seq.

10. To ensure hospitals and other health facilities are able to adequately treat patients legally isolated as a result of COVID-19, the Director of the California Department of Public Health may waive any of the licensing requirements of Chapter 2 of Division 2 of the Health and Safety Code and accompanying regulations with respect to any hospital or health facility identified in Health and Safety Code section 1250. Any waiver shall include alternative measures that, under the circumstances, will allow the facilities to treat legally isolated patients while protecting public health and safety. Any facilities being granted a waiver shall be established and operated in accordance with the facility's required disaster and mass casualty plan. Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

11. To support consistent practices across California, state departments, in coordination with the Office of Emergency Services, shall provide updated and specific guidance relating to preventing and mitigating COVID-19 to schools, employers, employees, first responders and community care facilities by no later than March 10, 2020,

12. To promptly respond for the protection of public health, state entities are, notwithstanding any other state or local law, authorized to share relevant medical information, limited to the patient's underlying health conditions, age, current condition, date of exposure, and possible contact tracing, as necessary to address the effect of the COVID-19 outbreak with state, local, federal, and nongovernmental partners, with such information to be used for the limited purposes of monitoring, investigation and control, and treatment and coordination of care. The



**page 4 of 5**

EXHIBIT 2
EXHIBIT 2

notification requirement of Civil Code section 1798.24, subdivision (i), is suspended.

13. Notwithstanding Health and Safety Code sections 1797.52 and 1797.218, during the course of this emergency, any EMT-P licensees shall have the authority to transport patients to medical facilities other than acute care hospitals when approved by the California EMS Authority. In order to carry out this order, to the extent that the provisions of Health and Safety Code sections 1797.52 and 1797.218 may prohibit EMT-P licensees from transporting patients to facilities other than acute care hospitals, those statutes are hereby suspended until the termination of this State of Emergency.

14. The Department of Social Services may, to the extent the Department deems necessary to respond to the threat of COVID-19, waive any provisions of the Health and Safety Code or Welfare and Institutions Code, and accompanying regulations, interim licensing standards, or other written policies or procedures with respect to the use, licensing, or approval of facilities or homes within the Department's jurisdiction set forth in the California Community Care Facilities Act (Health and Safety Code section 1500 et seq.), the California Child Day Care Facilities Act (Health and Safety Code section 1596.70 et seq.), and the California Residential Care Facilities for the Elderly Act (Health and Safety Code section 1569 et seq.). Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

_____
ALEX PADILLA
Secretary of State

**page 5 of 5**

**EXHIBIT 8**

September 21, 2020

## COVID-19 RETURN TO WORK AGREEMENT
## WITH DGA, IATSE, SAG-AFTRA AND TEAMSTERS/BASIC CRAFTS

This Agreement is entered into by and between:

The Directors Guild of America ("DGA"), on the one hand, and certain Companies represented by the Alliance of Motion Picture and Television Producers ("AMPTP") that are signatory to the 2020 Basic Agreement and 2020 Freelance Live and Television Tape Agreement and Netflix Productions LLC, on the other hand;

The International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists and Allied Crafts of the United States, its Territories and Canada ("IATSE") on behalf of itself and its Locals in North America, on the one hand, and certain Companies represented by the AMPTP that are signatory to the agreements referenced in Item 1.b. below, Netflix Productions, LLC and Netflix Animation, LLC, on the other hand;

The Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA"), on the one hand, and certain Companies represented by the AMPTP that are signatory to the 2020 Codified Basic Agreement, the 2020 Television Agreement, the 2020 Television Animation Agreement and the 2020 Basic Cable Animation Agreement, Netflix Productions, LLC, Netflix Animation, LLC and NF Voices, LLC on the other hand;

The "Basic Crafts Unions" (which comprise Studio Transportation Drivers, International Brotherhood of Teamsters ("Teamsters Local #399"); International Brotherhood of Electrical Workers, Local #40 ("IBEW Local #40); United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Local #78; Southern California District Council of Laborers and its affiliate, Studio Utility Employees, Local #724 and Operative Plasterers and Cement Masons International Association of the United States and Canada, Local #755 ("OPCMIA, Local #755")), on the one hand, and certain Companies represented by the AMPTP that are signatory to the 2018 agreements with each of the Basic Crafts Unions that are referenced in Item 1.b. below, Apple Studios LLC, Netflix Productions, LLC and Netflix Animation, LLC on the other hand; and

Theatrical Drivers and Helpers, Local Union #817, International Brotherhood of Teamsters ("Teamsters Local #817"), on the one hand, and certain Companies represented by the AMPTP that are signatory to the agreements referenced in Item 1.b. below and Netflix Productions, LLC, on the other hand.

Page 1 of 60

**EXHIBIT 9**

The Companies referenced above are each hereinafter referred to as the "Producer" or collectively as the "Producers." The other parties referenced above are each hereinafter referred to as the "Union" or collectively as the "Unions." Together, the Producers and Unions are hereinafter referred to as "the parties."

The parties agree that preventing the spread of COVID-19 and maintaining a safe and healthy working environment is of utmost importance. This shared goal can only be achieved through the participation, support and commitment of the Producers, Unions and every employee, at all levels of the production. The Producers will implement COVID-19 health and safety protocols and procedures carefully crafted to ensure a safe and healthy working environment. It is each individual's responsibility and duty to comply with those protocols and procedures, not only for the individual's own protection, but also for the protection of others in the workplace. All employees covered under this Agreement, as well as executives and producers who come into contact with such employees, must be prepared to engage in good safety practices, including practicing hand hygiene, self-monitoring for COVID-19 symptoms, maintaining social distancing and wearing appropriate PPE, while at the workplace if the COVID-19 health and safety protocols are to be effective. Individuals should also recognize that when it comes to COVID-19, their actions outside the workplace have an impact on the health and safety of those they encounter at the workplace, and so it is important to exercise good judgment and maintain safety practices when not at the workplace. It is only through the dedicated partnership of all involved that production will safely resume.

1.    **Term and Scope**:

    a.    *Term*: The parties acknowledge that this Agreement is a temporary agreement, intended to last only during the duration of the COVID-19 pandemic. The term of this Agreement shall commence on September 21, 2020 and extend to and include April 30, 2021. The provisions of this Agreement have been negotiated based on the present conditions, which include currently available scientific/medical information, current levels of infection, public health authorities' current guidelines and recommendations and the current lack of a vaccine for COVID-19. The parties acknowledge that the conditions surrounding COVID-19 are subject to continuous change, and so they agree to meet one (1) month after the effective date of this Agreement and every two (2) months thereafter to discuss whether to make any modifications to this Agreement in light of the conditions and information that is available at such time. The parties may mutually agree to terminate this Agreement prior to April 30, 2021 if warranted by the circumstances.

    b.    *Scope:* The provisions of this Agreement apply to all employees employed under the Agreements listed below, unless specified otherwise.

        DGA Basic Agreement and DGA Freelance Live and Television Tape Agreement;

SAG-AFTRA Codified Basic Agreement, SAG-AFTRA Television Agreement, SAG-AFTRA Television Animation Agreement and SAG-AFTRA Basic Cable Animation Agreement;

All collective bargaining agreements that a Producer has with the IATSE or an IATSE Local Union for motion picture production throughout North America;

All collective bargaining agreements that a Producer has with a Teamster Local Union for motion picture production throughout the United States (including any individual agreements covering New Media productions);

Agreement between Producer and IBEW Local #40;

Agreement between Producer and OPCMIA, Local #755;

Agreement between Producer and Southern California District Council of Laborers and its affiliate, Studio Utility Employees, Local #724; and

Agreement between Producer and United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local #78.

This Agreement contains the entire agreement and understanding among the parties with respect to the temporary modifications to such agreements that are necessary in light of COVID-19. Provided that the Producer complies with the pre-employment testing provisions of this Agreement, no further action on the part of the Producer with respect to COVID-19 is necessary before engaging and/or returning individuals to work under the Agreements referenced above.

The parties intend this Agreement to address the subjects covered in the White Paper. In some instances, the parties have agreed to incorporate portions of the White Paper. (See Item 17 below.) In other instances, the parties have negotiated additional or different provisions in this Agreement regarding subjects covered by the White Paper.

c.   ***Enabling Clause***: On a case-by-case basis, one or more Producers or the Union may request certain modifications to the terms and provisions contained in this Agreement to be applicable only to a specific production(s). The party proposing the modification shall provide all appropriate and necessary information and documentation for the other party(ies) to evaluate the proposed modification. The Union(s) or the Producer(s), as applicable, shall give good faith consideration to said modifications and make reasonable efforts to respond to the other party within three (3) business days of receipt of the supporting information and documentation. Any such modifications to this Agreement shall be memorialized in a letter signed by all affected parties and shall only apply to the specific production.

d.

**EXHIBIT 9**

e.      When a company that is related to or affiliated with a Producer signatory to one of the collective bargaining agreements described in Item 1.b. above produces a motion picture under the terms of that collective bargaining agreement, that company shall also be bound by this Agreement.

2.   **Health Screening**:

The following applies to all employees other than those who work exclusively remotely:

a.   ***Testing:***

i.      *Pre-Employment*: Prospective employees shall be tested for COVID-19 prior to the start of employment in accordance with subparagraph (1), (2) or (3) below:

(1)      The employee may be tested using a lab-based PCR diagnostic test (*i.e.*, not a rapid test) conducted within forty-eight (48) hours prior to the start of employment, except that a test conducted within seventy-two (72) hours shall be acceptable until December 31, 2020, at which time the test must be conducted within forty-eight (48) hours unless the parties agree otherwise; provided, however, Producer shall continue to make good faith efforts to find and transition to lab-based PCR tests with a turnaround time of less than seventy-two (72) hours prior to December 31, 2020. The test result must be obtained prior to the start of employment. The parties agree that a pre-employment test is timely if a prospective employee who is scheduled to start work on a Monday is tested at any time on the immediately preceding Friday.

(2)      If it is not viable for the prospective employee to take a lab-based PCR diagnostic test, the results of which are returned in forty-eight (48) hours (or until December 31, 2020, within the seventy-two (72) hour period described in subparagraph (1) above), the prospective employee shall undergo a lab-based PCR diagnostic test as close in time to the start of employment as may reasonably be achieved, while still allowing for results to be obtained prior to the start of employment. In this case, the prospective employee shall also undergo a rapid test within forty-eight (48) hours prior to the start of employment. The results of both the lab-based PCR diagnostic test and rapid test must be obtained prior to the start of employment.

(3)      Alternatively, the employee may be tested using two (2) rapid tests conducted within forty-eight (48) hours prior to the start of employment using samples collected at the same time. Both test results must be obtained prior to the start of employment.

**EXHIBIT 9**

Notwithstanding the foregoing, the Producer need not conduct a pre-employment test if the employee has been tested by a Producer within forty-eight (48) hours prior to starting work for the Producer, and the test yielded a negative result.[1] If the test relied upon to satisfy this requirement was a lab-based PCR diagnostic test, it is acceptable for the test to have been administered within seventy-two (72) hours prior to the employee's start of work.  If the test was conducted by a different Producer, the employee must provide sufficient documentation establishing the time and result of the test.

Producer may establish a policy requiring prospective employees to undergo additional pre-employment testing beyond the foregoing.  If so, the Producer will notify the prospective employee of the policy prior to the first pre-employment test.

It is understood that offers of employment are contingent on the prospective employee undergoing pre-employment test(s) required by the Producer which yield(s) a negative result.[2] A prospective employee who undergoes the requisite pre-employment test(s) shall be considered "employed" if the test(s) yield(s) a negative result.  However, the employee may also be required to complete a Health Assessment Survey and/or to conduct a temperature check in accordance with instructions supplied by the Producer before he/she starts his/her first day of work.  If the Producer instructs an employee with the requisite negative COVID-19 test result(s) to stay home on his/her first day of work based on the results of a temperature check and/or Health Assessment Survey, the employee will be paid pursuant to any sick leave provisions of the applicable

---

[1] In addition, a pre-employment test is not required for:  (1) employees at facilities who returned to work prior to the effective date of this Agreement without a pre-employment test, and who continue to work during the term of this Agreement; and (2) performers employed for a voiceover, ADR or looping session outside a personal or home studio who are alone in a space (e.g., a recording booth) while recording, and who are not required to come within six (6) feet of any other individual at the location where work is to be performed for longer than fifteen (15) minutes.

[2] This provision is not intended to alter terms of any existing engagement (as defined in Section 4.A. of Schedule A, Section 6.B. of Schedules B, C and K-II, and Section 3.A. of Schedules H-I and K-I of the SAG-AFTRA Codified Basic Agreement) or personal services agreement negotiated prior to the effective date of this Agreement.  This provision shall not be construed to prejudice any party's position with respect to a Producer's obligations under an individual's existing engagement (as defined in the preceding sentence) or personal services agreement in the event that individual tests positive in a pre-employment test.  In addition, nothing herein shall preclude the parties from negotiating better terms.

**EXHIBIT 9**

collective bargaining agreement or an applicable tatute, if any, and once exhausted, pursuant to the temporary COVID-19 paid sick leave provisions in Item 7 below. Item 7.k. will apply to determine whether and when the employee may commence work.

ii.    *Periodic*:

(1)    During employment, "Zone A" employees who work five (5) or more days in a week shall be tested for COVID-19 at least three (3) times per week. At least one test per week shall be a lab-based PCR diagnostic test, the results of which must be returned within forty-eight (48) hours (or until December 31, 2020, within the seventy-two (72) hour period described in subparagraph i.(1) above). The remaining tests required in that week may be rapid tests. The parties agree that it may be necessary to conduct additional testing of performers or background actors and crew involved in production of scenes that require close or intimate contact or extreme exertion. "Zone A" consists of (A) all performers and background actors working on set; and (B) all employees who are present in a workspace with a performer or background actor while the performer or background actor is not wearing PPE.

"Zone A" employees who work fewer than five (5) days in a week need not be tested more frequently than once within the seventy-two (72) hours prior to each day of employment. At least one test per week shall be a lab-based PCR diagnostic test, the results of which must be returned within forty-eight (48) hours (or until December 31, 2020, within the seventy-two (72) hour period described in subparagraph i.(1) above). Any other tests required in that week may be rapid tests.

A Producer need not commence periodic testing for a "Zone A" employee if: (A) the employee starts and concludes employment within seventy-two (72) hours following the time the employee took a pre-employment test which yielded a negative result; or (B) the performer is employed for a voiceover, ADR or looping session outside a personal or home studio, is alone in a space (e.g., a recording booth) while recording and is not required to come within six (6) feet of any other individual at the location where work is to be performed for longer than fifteen (15) minutes.

(2)    During employment, "Zone B" employees shall be tested for COVID-19 at least once per week if using a lab-based PCR diagnostic test. The results of the test must be returned within forty-eight (48) hours (or until December 31, 2020, within the

**EXHIBIT 9**

seventy-two (72) hour period described in subparagraph i.(1) above).  Alternatively, a "Zone B" employee shall be tested at least twice per week using a rapid test; the results of the tests must be returned within forty-eight (48) hours.

"Zone B" consists of those employees who work on a "hot" set, but who are not present in a workspace with a performer or background actor while the performer or background actor is not wearing PPE, all Zone B employees while they work during prep, and employees who work in any other area where the production has a footprint that is not an area where "Zone C" or "Zone D" employees work.

(3)     During employment, "Zone C" employees shall be tested for COVID-19 at least once every two (2) weeks using a lab-based PCR diagnostic test.  The Producer will give good faith consideration to staggering testing of "Zone C" employees, so that one-half of the "Zone C' employees on a production is tested in one week, and the other half is tested in the following week.  The results of the test must be returned within forty-eight (48) hours (or until December 31, 2020, within the seventy-two (72) hour period described in subparagraph i.(1) above).  The parties agree that "pool testing" may be used for "Zone C" employees, which must comply with the then-current FDA authorization for pool testing. "Pool testing" refers to combining samples from several people and conducting one laboratory test on the combined pool of samples to detect the presence of SARS-CoV-2, the virus that causes COVID-19.

"Zone C" consists of those employees who:

(A)     are able to wear PPE at all times while working;

(B)     only work with other employees who are also able to wear PPE at all times while working;

(C)     are not required to be within (6) feet of other individuals for longer than fifteen (15) minutes while working (provided that if the local governmental authority has issued guidelines with a more stringent time/distance standard for determining when individuals come into "close contact" with other individuals for purposes of COVID-19 contact tracing, the standard in such guidelines shall apply instead); and

(D)

(E)     do not come into contact with "Zone A" or "Zone B" employees in the course of their work, unless both the Zone "A" or "Zone B" employee and the "Zone C" employee are wearing PPE at all times and do not come within six (6) feet of each other for longer than fifteen (15) minutes; provided, however, "Zone C" employees may not enter "Zone A" or "Zone B" when "Zone A" or "Zone B" employees are present unless they have tested negative in accordance with the procedures set forth below.

Producer shall provide the Union(s) representing "Zone C" employees with a list of "Zone C" employees on the production prior to the start of their employment. If any Union has any objections to the characterization of an employee as a "Zone C" employee, it may contact the Producer to discuss whether such employee should instead be considered a "Zone B" employee.

A "Zone C" employee may not go to a "hot" set or other area where "Zone A" or "Zone B" employees are present at work unless he/she has tested negative within forty-eight (48) hours prior to entry using a lab-based PCR diagnostic test (or until December 31, 2020, within the seventy-two (72) hour period described in subparagraph i.(1) above). Alternatively, the "Zone C" employee may undergo two rapid tests within forty-eight (48) hours prior to entry; both tests must be negative.

(4)     "Zone D" employees do not require periodic testing after a pre-employment test. "Zone D" consists of employees who meet the requirements for a "Zone C" employee listed in Item 2.a.ii.(3)(A)-(D) above and are employed in one of the following classifications:[3]

(A)     Local #600 (Publicists) – All classifications, except for Unit Publicists.

(B)     Local #695 – All projection personnel, all post-production personnel and any employee employed on animated motion pictures.

---

[3] A Producer which owns a studio facility shall contact the applicable Union(s) to discuss testing for Union-represented back lot employees hired to work in a classification other than those listed above, based on the circumstances of their employment. Union-represented back lot employees who returned to work at a Producer-owned studio facility prior to the effective date of this Agreement without periodic testing may continue to work without periodic testing until an agreement is reached between the Producer and the Union(s), even if they are not employed in one of the listed classifications.

**EXHIBIT 9**

(C)     Local #700 (Post-Production) – All classifications when employed at a facility and/or in the archive department, or when employed on animated motion pictures.

(D)     Local #700 Screen Story Analysts – All classifications.

(E)     Local #700 Lab Technicians – Still lab and film vault personnel.

(F)     Local #700 Warner Bros. Advanced Media Services (Film Archives) – All classifications.

(G)     Local #705 – The following classifications when employed at a costume department house or studio wardrobe department and/or in the archive department:

> Costume Department Foreperson
> Costume Department Supervisor
> Costumer Keyperson
> Costumer Entry Level
> Checkers
> Stock Clerk
> Table Person
> Figure Maker
> Head Dyer
> Beader
> Cleaner
> Finisher
> Workroom Apprentice

(H)     Local #800 (Set Designers and Model Makers) – All classifications, unless required to work with the shooting crew.

(I)     Local #800 (Illustrators and Matte Artists) – All classifications.

(J)     Local #800 (Scenic, Title and Graphic Artists) – All classifications.

(K)     Local #839 – all classifications.

(L)     Local #871 – Script Coordinators and Writers' Room Assistants.

(M)

**EXHIBIT 9**

A "Zone D" employee may not go to a "hot" set or other area where "Zone A" or "Zone B" employees are present at work unless he/she has tested negative within forty-eight (48) hours prior to entry using a lab-based PCR diagnostic test (or until December 31, 2020, within the seventy-two (72) hour period described in subparagraph i.(1) above). Alternatively, the "Zone D" employee may undergo two rapid tests within forty-eight (48) hours prior to entry; both tests must be negative.

(5)     If an employee tests positive for COVID-19, the Producer shall follow CDC guidelines in effect at the time or the guidelines of the local governmental authority in effect at the time, whichever is stricter, with respect to treatment of other employee(s) (*e.g.*, testing, quarantine or self-isolation) who have been exposed to the employee who tested positive. The employee(s) who was (were) exposed to the employee who tested positive shall also comply with those guidelines.

(6)     Consistent with current CDC guidelines, Producer may establish a policy that:

(A)     Individuals previously diagnosed with symptomatic COVID-19 who remain asymptomatic after recovery need not be tested within 3 months after the date of symptom onset for the initial COVID-19 infection.

(B)     Individuals who develop new symptoms consistent with COVID-19 during the 3 months after the date of initial symptom onset will be tested unless an alternative etiology can be identified by a healthcare provider.

(C)     For individuals who never developed symptoms, the date of first positive RT-PCR test for SARS-CoV-2 RNA should be used in place of the date of symptom onset.

(7)     Failure to obtain a test result within the requisite period shall not prevent any employee from continuing to work, so long as one of the following conditions is met:

(A)     The employee has taken a rapid test and received a negative result within the past twenty-four (24) hours; or

(B)     The employee is being periodically tested more frequently than the minimum periodic testing requirements of this Agreement, and all other tests taken and received within the past seven (7) calendar days have yielded negative results.

**EXHIBIT 9**

iii.   *Testing in Connection with Air Travel*: If an employee is traveling by air, the employee shall be tested for COVID-19 and obtain the results of the test prior to the flight (the "pre-flight test"). Pre-flight testing shall be subject to the same requirements as pre-employment testing (see Item 2.a.i. above), except that an employee who has already been tested in accordance with the periodic testing requirements in Item 2.a.ii. above without interruption need not undergo additional testing before the flight so long as the test was conducted within forty-eight (48) hours of departure (or, if a lab-based PCR diagnostic test was administered, within the seventy-two (72) hour period as described in subparagraph i.(1) above, until December 31, 2020).

If the employee has already begun periodic testing pursuant to Item 2.a.ii. above, he or she may commence work upon arrival at the destination, provided that the employee continues to undergo periodic testing without interruption.

If the employee has not yet begun periodic testing, he or she shall be tested again after the flight prior to starting work pursuant to Item 2.a.i above, but no sooner than forty-eight (48) hours after arrival at the final destination, except that:

(1)   An employee who undergoes a pre-flight test within forty-eight (48) hours of departure time and obtains test results prior to departure may work upon arrival at the final destination during the forty-eight (48) hour period following the time of the pre-flight test; and

(2)   If the employee is scheduled to commence work at the final destination before results can be obtained from a test that is conducted forty-eight (48) hours after arrival, the Producer may test the employee after the flight, but within forty-eight (48) hours prior to the start of work (the "post-flight test"). The employee may start work at the final destination after receiving a negative test result, so long as the employee's first periodic test is conducted within forty-eight (48) hours of the post-flight test.

iv.   *Types of Tests and Consent to Testing*: When testing employees, Producers shall use diagnostic tests that test for the virus that causes COVID-19, which does not mean and shall not include antigen or antibody tests. Currently, the parties have agreed not to use antigen or antibody tests; however, they agree to continue to evaluate antigen and antibody tests, including information on the accuracy of available tests in the market and/or other scientific/medical information, to determine whether antigen or antibody tests may be appropriate for use in the future subject to the agreement of the parties. Testing may be done on- or off-site. Test results

**EXHIBIT 9**

shall be provided to the employee.  Prior to being tested, employees may be required to sign consent forms for the test and disclosure of test results. The Producer must comply with all applicable laws in regard to the issuance of consent forms and the disclosure of test results.  Consent forms shall not include waivers of the Producer's liability.  The Unions agree to make best efforts to assist the Producer in obtaining such consent forms from the employees they represent, if necessary.

v.   *Limited Testing Availability*: In the event that availability of COVID-19 testing is limited or there are known delays in processing of test results, the Producer and the Unions shall discuss the possibility of appropriate adjustments in the foregoing testing requirements according to the procedure set forth in Item 1.c. above.

vi.   *Testing Limited by Law*:  When production is taking place in a jurisdiction that limits or prohibits COVID-19 testing (including a jurisdiction that prioritizes who may be tested) or an employee is flying from or to such a jurisdiction, the Producer shall comply with the foregoing testing requirements to the extent permissible by law.  In the event that such circumstances arise, the Producer shall contact the Unions to notify them of the limitations imposed by the jurisdiction and the parties shall discuss the possibility of appropriate adjustments in the foregoing testing requirements according to the procedure set forth in Item 1.c. above.

vii.   *Testing in Jurisdictions With a Low or High Rate of Infection:* The foregoing COVID-19 testing requirements do not apply to work taking place in a jurisdiction with a low or high rate of COVID-19 infection. The parties shall discuss changes to the testing protocols in this Agreement for jurisdictions with either a low or high rate of infection according to the procedure set forth in Item 1.c. above.  Employees traveling by air to a location with a low rate of infection from a location that does not have a low rate of infection shall be tested pursuant to Item 2.a.iii. above ("Testing in Connection with Air Travel") and quarantined pursuant to the requirements of the governmental authority in the jurisdiction, if any.  (See Item 8 below for payment during quarantine prior to start of production or in connection with a move in production location.)

viii.   The parties shall discuss the feasibility of a system to address the employment of daily hires who have satisfied the Producer's COVID-19 training, testing and screening requirements and who can be called to work on short notice.

ix.   A Producer may implement more stringent testing protocols than those detailed in this Agreement.

x.

**EXHIBIT 9**

b. **_Health Assessment Survey_**:

    i.    Employees will be required to complete a health assessment survey prior to the start of work each day.

    ii.    The Producer may require the employee to submit the health assessment survey electronically (including by means of an application on their personal cell phone) or in person.

c. **_Temperature Checks_**:

    i.    Employees may be subject to temperature checks, to take place at least once per day.

    ii.    Employees who do not pass the temperature check will not be permitted on the premises and will be directed to contact their healthcare provider, provided that an employee who does not pass a temperature check conducted at the work site may rest for fifteen (15) minutes (or will be advised to return to the temperature checkpoint after fifteen (15) minutes), before having his/her temperature checked again.  If the employee does not pass the second temperature check, he/she will be denied entry to the premises and will be directed to contact his/her healthcare provider.  No payment is due for time that an employee spends undergoing a temperature check at the entrance to the work site.  Employees who are denied entry to the premises due to a failed temperature check will be paid pursuant to any sick leave provisions of the applicable collective bargaining agreement or an applicable statute, if any, and once exhausted, pursuant to the temporary COVID-19 paid sick leave policy in this Agreement.

d. **_Compensation for Time Spent Screening_**:

    i.    An employee other than a background actor who travels outside his/her home to undergo a test on a day in which the employee does not work for Producer shall receive a stipend (no fringe) of two hundred fifty dollars ($250.00) ($250.00 CAD, if applicable).  A background actor shall receive a stipend of one hundred dollars ($100.00), which shall be subject to pension and health contributions only if the background actor is ultimately employed by the Producer following the test.  Such stipend may also cover payment for time spent completing COVID-19 training of up to one (1) hour, which need not occur on the same day as the test, and time spent completing start paperwork, if a Producer elects to require the employee to complete start paperwork on a day when the employee does not work.

    An employee who undergoes a test at home on a day in which the employee does not work for the Producer shall receive a stipend of twenty dollars ($20.00) ($20.00 CAD, if applicable).

**EXHIBIT 9**

However, no stipend is due if the employee is otherwise paid for the day (*e.g.*, payment of a travel allowance to a performer or payment for a travel day to a member of the crew). Also, no stipend is due to a Director of a theatrical motion picture, a Schedule F performer or a series contract performer. Producer may individually negotiate payment with IATSE employees employed in the jurisdiction of the IATSE Basic Agreement or from within the geographical jurisdictions of the IATSE Area Standards Agreement or IATSE New York Local Agreements (*i.e.*, Locals #52, #161, #764, #798 and USA 829) to perform work outside the limits of the United States, its territories and Canada.

ii.      An employee who is required to self-administer a temperature check or fill out a Health Assessment Survey prior to reporting to work on a day in which such employee also does work for Producer shall be paid an additional one-tenth (1/10) of an hour. Once the employee's engagement has commenced, if the Producer instructs the employee not to report to work based on the results of the temperature check and/or Health Assessment Survey, the employee will receive paid sick leave for that day pursuant to any sick leave provisions of the applicable collective bargaining agreement or an applicable statute, if any, and once exhausted, pursuant to the temporary COVID-19 paid sick leave policy in this Agreement. Paid sick leave shall be inclusive of the one-tenth (1/10) of an hour payment for undergoing the temperature check or filling out the Health Assessment Survey.

The foregoing does not apply to employees employed on an "on-call" basis, employees employed under the DGA Basic Agreement or FLTTA, series contract performers, performers employed under Schedule F and stunt coordinators employed under Schedule K-III.

In no event shall time spent undergoing health screening procedures prior to reporting to work affect the employee's start time, meal times, rest periods or overtime.

iii.     Any time that an employee spends undergoing health screening procedures after reporting to work shall be considered work time.

3.      **Implementation of Work Groups to Limit Contact and Movement**

Each Producer will adopt a system which divides employees into work groups (sometimes referred to as "zones" or "pods") that are designed to minimize contact and interaction between performers and background actors who cannot wear PPE while performing their duties, on the one hand, and the rest of the crew, on the other hand, and specifies where employees in each group may go during the course of their workday. The system may also be used to separate employees in the same "Zone," as described in Item 2.a. above, into distinct work groups in order to further limit contact and interaction among them and to maintain a safe and healthful working environment. While the exact

**EXHIBIT 9**

details of the system may vary from production to production, the overall system should be consistent with this goal.

For example, a system could consist of the following groups of employees: those who are never permitted to go to set because their duties do not require them to be on set; those who are permitted to go on set to perform their duties, but only when performers and background actors are not present; those who are permitted to go on set and perform their duties while performers and background actors are present, but must maintain physical distance from the performers/background actors; and those who may interact with performers/background actors at a distance of less than six (6) feet because their duties require them to do so.

The foregoing does not apply to employees employed on animated motion pictures.

4.    **COVID-19 Compliance and Enforcement**

    a.    COVID-19 Compliance Supervisor

        i.    The Producer shall designate a COVID-19 Compliance Supervisor who is responsible for COVID-19 safety compliance and enforcement on each production. The COVID-19 Compliance Supervisor may be assigned to oversee COVID-19 safety compliance and enforcement on one or more productions. At the Producer's discretion, more than one COVID-19 Compliance Supervisor may be engaged. The COVID-19 Compliance Supervisor designated on the production shall be identified on the call sheet. A Producer which owns a studio facility shall designate a COVID-19 Compliance Supervisor who is responsible for COVID-19 safety compliance and enforcement with respect to facility maintenance work and studio departmental operations. The Producer shall designate a COVID-19 Compliance Supervisor to be responsible for COVID-19 safety compliance and enforcement at the Producer's premises where employees are employed on animated motion pictures. The COVID-19 Compliance Supervisor shall be accessible at all times during working hours, which may include via telephone, and all personnel shall have access to the COVID-19 Compliance Supervisor. It is understood that a Producer may refer to the individual who performs these functions by a different title.

        With respect to live action productions, the COVID-19 Compliance Supervisor or a member of the COVID-19 compliance team who has undergone sufficient training and has the authority to enforce the safety protocols in this Agreement shall be physically present on the production(s) to monitor and enforce COVID-19 safety protocols beginning from general crew call and continuing until camera wrap. (This requirement is not intended to obligate a Producer to engage an additional individual on the production.) Because employees assigned to the production may be working at various sites, the parties understand that the Compliance Supervisor or a member of the compliance team may need to

**EXHIBIT 9**

out monitoring and enforcement functions. With respect to animated productions, the COVID-19 Compliance Supervisor or a member of the COVID-19 compliance team who has undergone sufficient training and has the authority to enforce the safety protocols in this Agreement shall be physically present on the Producer's premises during regular business hours, which may include "roaming" various locations, depending on where his/her physical presence is most needed.

The parties further agree that the COVID-19 Compliance Supervisor or a member of the compliance team can adequately monitor and enforce COVID-19 safety protocols without a constant physical presence on certain productions such as multi-camera dramatic series and non-dramatic productions (*e.g.,* quiz and game shows, talk shows, etc.), or when activity on the production is limited (*e.g.,* second unit work, green screen work, etc.) In those situations, the Compliance Supervisor or a member of the compliance team shall be physically present on the production, but the determination of the extent of that presence shall be reserved to the good faith judgment of the Compliance Supervisor.

ii.    The Producer shall ensure that the COVID-19 Compliance Supervisor has access to medical professionals and other subject matter experts who can address any questions that may arise regarding health and safety.

iii.    The COVID-19 Compliance Supervisor shall identify and report any COVID-19 health and safety concerns (*e.g.*, issues of non-compliance with the Producer's COVID-19 health and safety protocols and procedures) to the Producer's safety department (or, if the Producer does not have a safety department, to the individual designated at the start of production to receive those reports). The COVID-19 Compliance Supervisor shall work with the appropriate party (*e.g.*, department head, other production management personnel, the Producer's safety executives, Labor Relations) to address the concern.

The COVID-19 Compliance Supervisor may pause production or other work activities if he/she identifies a COVID-19 health and safety concern (*e.g.*, issues of non-compliance with the Producer's COVID-19 health and safety protocols and procedures), to advise the appropriate party and resolve the concern. The COVID-19 Compliance Supervisor shall also have the ability to effectively recommend discipline or termination for violations of COVID-19 health and safety protocols.

b.    The parties acknowledge that promoting health and safety requires the collective efforts of all individuals involved on production, and that it is important to create an environment in which individuals are comfortable raising health and safety concerns so that they can be addressed. The COVID-19 Compliance Supervisor or his/her designee shall provide training to the UPM, First AD/Key Stage

**EXHIBIT 9**

Manager and other department heads so that they can assist in the execution of the COVID-19 Compliance Supervisor's directives with respect to employees under their supervision. In the event that any individual believes that there has been a violation of the Producer's COVID-19 health and safety protocols, he or she should report the matter to his/her supervisor, who shall elevate the matter to the COVID-19 Compliance Supervisor as necessary to resolve any issues. Individuals may also report any concerns to the Producer's safety hotline or, if there is none, the individual designated at the start of the production to receive those reports.

No employee shall be discharged or otherwise disciplined for refusing to work on a job that exposes the individual to a clear and present danger to life or limb relating to COVID-19, or for making a good faith report relating to the safety of another employee exposed to a clear and present danger to life or limb relating to COVID-19.

c.  Producer shall hire additional staff as it deems necessary to work under the COVID-19 Compliance Supervisor's supervision and assist in carrying out his/her duties. A Producer may elect to hire an employee from a classification represented by the IATSE, Teamsters, Basic Crafts Unions or DGA to perform both COVID-19 compliance and enforcement duties and work covered by one of the agreements referenced in Item 1.b. above ("bargaining unit work"), provided that the employee is hired in addition to the regular complement of crew on the production. Employees so hired shall be covered by the applicable collective bargaining agreement and subject to the minimum terms and conditions applicable to the classification in which the employee is engaged. During the course of the workday, the employee may be assigned to perform COVID-19 compliance and enforcement duties and/or bargaining unit work, the extent and duration of such duties being at the Producer's discretion.

It is understood that employees who are part of the regular complement of crew may perform duties related to COVID-19 compliance and enforcement that are incidental to the employee's bargaining unit work and do not interfere with the employee's performance of bargaining unit work.

The Unions agree that the assignment of COVID-19 compliance and enforcement duties to members of their respective bargaining units is on a non-exclusive basis and without any requirement for additional minimum compensation, and that Producers' practices in so assigning such duties shall not create exclusive jurisdiction or binding practice to assign any portion of such work to employees represented by any Union.

The COVID-19 Compliance Supervisor may make recommendations to the Producer regarding the level of staffing required within his/her office in order to effectively enforce COVID-19 health and safety protocols, and shall also make recommendations regarding the selection of staff who will be under his/her direct supervision.

**EXHIBIT 9**

d.  The COVID-19 Compliance Supervisor or his/her designee will provide instruction to employees on COVID-19-related protocols as needed.

e.  The Producer may comply with its obligations under this provision by hiring the COVID-19 Compliance Supervisor and any other members of the COVID-19 compliance team directly or by contracting with a third party to supply such personnel.

5.  **Training**:

a.  ***COVID-19 Health and Safety Protocol Training***:

i.  Contract Services Administration Trust Fund ("CSATF"), the IATSE Training Trust Fund ("IATTF"), the Directors Guild-Producer Training Plan and the New York Assistant Directors Training Program shall develop a COVID-19 health and safety protocol training (the "COVID-19 Training") for all employees in consultation with the Industry-wide Joint Labor-Management Safety Committee, consistent with the usual process for developing safety training programs. Representatives from the DGA, Teamsters, Basic Crafts Unions and SAG-AFTRA shall also be included in the committee for this purpose. For those IATSE Local Unions not associated with CSATF, such training shall be supplied by the IATSE Training Trust Fund, except that training for employees employed under a Canadian IATSE Local agreement shall be supplied through the applicable organization responsible for health and safety matters in the motion picture industry, *e.g.*, ActSafe. DGA training shall be supplied through the Directors Guild-Producer Training Plan and the New York Assistant Directors Training Program.

When the COVID-19 Training has been developed, successful completion of such training shall be a condition of employment for all employees. An employee employed in a classification for which a roster or Qualification List exists must complete such COVID-19 Training no later than sixty (60) days following the execution of this Agreement as a requirement for continued placement on the roster or Qualification List. Details of the COVID-19 Training to be discussed.

The COVID-19 Training shall be updated from time to time as necessary to reflect changes in circumstances, such as scientific developments or agreed changes to protocols in this Agreement. Any updates may be distributed to those who have already taken the COVID-19 Training via bulletins or briefings at daily safety meetings.

ii.  Prior to the development of the COVID-19 Training, employees shall be required to undergo COVID-19 health and safety protocol training developed by each Producer before commencing work.

iii.

**EXHIBIT 9**

b.   ***Compensation for Time Spent Training***: Each employee who takes the COVID-19 Training shall be paid a stipend of $20.00 for each hour that he or she attends such training outside of his or her employment, unless the employee is otherwise already being paid for the day (*e.g.*, payment of a travel allowance to a performer or payment for a travel day to a member of the crew). No stipend is due if a series contract performer takes training on a day within his/her span.

6.   **Personal Protective Equipment**:

a.   Producers shall provide all employees with face coverings to be worn at all times on the job site, except when eating, drinking, or when their job duties prevent them from doing so.

b.   Employees who are working in close contact with another individual (where "close contact" is defined as being within six feet of another individual for fifteen minutes or more, provided that if the local governmental authority has issued more stringent time/distance guidelines defining "close contact," such definition shall apply instead) shall be provided with a face shield in addition to a face covering, and may also be provided with goggles.

c.   The face coverings, face shields and/or goggles provided may be disposable or reusable. If such personal protective equipment is reusable, it may only be reused by the same individual, unless sanitized between users.

d.   Employees who wish to bring and utilize their own face coverings, face shields and/or goggles may do so, provided that the COVID-19 Compliance Supervisor or his/her designee approves in advance.

7.   **Temporary COVID-19 Paid Sick Leave**

a.   An employee shall receive temporary COVID-19 paid sick leave for each day that the employee is absent from work due to an Eligible COVID-19 Event for which the employee is not otherwise paid by the Producer until the earlier of the following:

The employee returns to work or declines to return to work; or

The end of the employee's guaranteed employment period, provided that, for purposes of determining temporary COVID-19 paid sick leave, this period shall include the number of days that it was reasonably anticipated that the employee would work.

However, in no event shall an employee receive more than a total of ten (10) days of temporary COVID-19 paid sick leave per Producer, which may cover one or more Eligible COVID-19 Events.

**EXHIBIT 9**

b.     There shall be no accrual period.  Temporary COVID-19 paid sick leave shall be immediately available to employees upon commencing work.

c.     Temporary COVID-19 paid sick leave may be used for any of the following "Eligible COVID-19 Events," or any combination of Eligible COVID-19 Events:

   i.     The employee has tested positive for COVID-19 or exhibited symptoms of COVID-19.

   ii.    The Producer has requested that the employee isolate or self-quarantine because another person with whom he or she has been in close contact has tested positive for COVID-19 or exhibited symptoms of COVID-19.

   iii.   A member of the employee's household has tested positive for COVID-19 or exhibited symptoms of COVID-19.

   iv.    A public official or healthcare provider has requested that the employee isolate or self-quarantine due to COVID-19 (other than a quarantine described in Item 8 below).

   v.     The Employee must provide care for a child or senior, whose childcare or senior care provider ceases operations due to COVID-19.

   vi.    The Employee needs to care for a child, parent or spouse who is subject to a federal, state or local quarantine or isolation order related to COVID-19 or has been advised by a healthcare provider to self-quarantine related to COVID-19.

d.     For each day of temporary COVID-19 paid sick leave used by an employee, the employee shall receive payment as set forth below, based on the employee's contracted rate, but in no event more than $750 ($750 CAD, if applicable) per day and $7,500 ($7,500 CAD, if applicable) in the aggregate.  An employee who is paid his/her full regular salary or guarantee for a period that includes absence due to an Eligible COVID-19 Event shall not receive temporary COVID-19 paid sick leave in addition to his/her salary or guarantee.

   i.     <u>IATSE/Teamsters/Basic Crafts Unions</u>

      (1)     Daily employees – payment for a minimum call.

      (2)     Hourly employees without a minimum call – payment for eight (8) hours.

      (3)     Weekly employees – one-fifth (1/5) of weekly/on-call rate.

      (4)     Employees whose rates are subject to individual negotiation under the collective bargaining agreement – *pro rata* daily rate.

**EXHIBIT 9**

*Fringe benefits*: Such payments shall be subject only to health/welfare contributions, pension contributions and IAP/annuity contributions, if applicable. Such payments shall not be subject to vacation or unworked holiday payments, nor any other fringe benefit contributions, except that paid sick leave for a daily employee employed under the Local #839 Agreement is inclusive of vacation and holiday pay.

ii.    <u>DGA</u>

(1)    Directors – one-fifth (1/5) of the weekly salary, or the daily rate for a Director who is engaged for daily employment as permitted under the Basic Agreement or FLTTA.

(2)    UPMs/Assistant Directors/Associate Directors employed under the Basic Agreement

   (A)    Daily employees – applicable daily rate.

   (B)    Weekly employees – one-fifth (1/5) of the studio weekly rate.

(3)    Associate Directors/Stage Managers employed under the FLTTA

   (A)    Prime Time Dramatic

      1)    Daily – applicable daily rate.

      2)    Weekly – one-fifth (1/5) of the studio weekly rate.

   (B)    Other than Prime Time Dramatic

      1)    Daily – payment for eight (8) hours (or twelve (12) hours if engaged on a daily flat basis).

      2))    Weekly – one-fifth (1/5) of the weekly rate.

Such payments shall be subject to pension and health contributions.

iii.    <u>SAG-AFTRA</u>

(1)    Day performer – daily rate.

(2)    Three-day performer – one-third (1/3) of the three-day rate.

(3)    Weekly performer – one-fifth (1/5) of the weekly rate.

(4)     Major role performer – performer's contracted rate, divided by the number of work days covered by the contracted rate.

(5)     Series contract performer – performer's "per episode" salary, divided by the number of scheduled work days for the episode.

A series contract performer shall receive temporary COVID-19 paid sick leave only under the following circumstances:

(A)     The performer's Eligible COVID-19 Event causes the performer to be absent for all or part of the production of a guaranteed episode in which he/she was scheduled to appear, and the performer is not otherwise paid his/her full episodic fee for that episode. If the performer is absent for the entire episode, he/she shall be paid temporary COVID-19 sick leave based on the number of scheduled shooting days. If the performer is absent for part of the episode, he/she shall be paid temporary COVID-19 sick leave based on the number of days in the shooting schedule less the number of days worked on the episode.

(B)     The performer's Eligible COVID-19 Event causes the performer to work outside his/her overall production period, in which case the performer shall be paid temporary COVID-19 sick leave based on the number of days worked outside the overall production period.

(C)     The performer has an Eligible COVID-19 Event that occurs outside his/her overall production period, in which case the performer shall be paid temporary COVID-19 sick leave based on the number of days of absence.

(6)     Background actor – daily rate.

(7)     Voice actor – session fee.

Such payments shall be subject to pension and health contributions.

A Schedule F deal performer or a performer employed on a multi-part closed-end picture under Schedule F who is absent because of an Eligible COVID-19 Event which occurs during the period of time that the performer is contracted to work for the Producer shall not be entitled to payment for such days under the temporary COVID-19 sick leave provision, unless the performer's guarantee is reduced as a result. If the performer is not replaced and cannot complete services within the contracted work period due to absence because of an Eligible COVID-19 Event, the Producer may recall the performer outside the contracted work

period for a number of non-consecutive days equal to the number of days the performer was absent due to the Eligible COVID-19 Event, subject to the performer's professional availability. The performer shall advise the Producer of any existing professional commitments outside the contracted work period and shall keep the Producer apprised of his/her professional availability by advising the Producer of any new professional commitments outside the contracted work period in a timely manner. The performer will cooperate to the fullest extent in trying to make his/her services available to the Producer if recalled outside the contracted work period. In the event the performer is recalled outside the contracted work period, he/she shall receive temporary COVID-19 sick pay for the number of days the performer's contracted work period was extended. The foregoing shall not be deemed to diminish any other rights of recall the Producer may possess.

Payments made under this temporary COVID-19 sick leave provision shall not impact any calculation of residuals.

e.    Producer may require the employee to submit verification (*e.g.*, a doctor's note) of the Eligible COVID-19 Event in order to receive more than three (3) days of temporary COVID-19 paid sick leave for such Eligible COVID-19 Event.

f.    Employees are not entitled to payment for any unused temporary COVID-19 sick leave under this Agreement.

g.    Paid sick days under this temporary COVID-19 sick leave provision shall not be considered workdays for any purpose under the applicable collective bargaining agreement; however, paid sick days may be counted for purposes of determining whether an employee is eligible for health coverage under the "alternative days eligibility rule" of the SAG-AFTRA Health Plan.

h.    Any requirements for prior notice of layoff (or pay in lieu of) in a collective bargaining agreement shall be suspended in the event that an employee is receiving payment pursuant to the foregoing temporary COVID-19 paid sick leave policy.

i.    If an employee has an Eligible COVID-19 Event while on distant location and is unable to return home, the Producer shall provide the employee with lodging and per diem while on distant location, in addition to temporary COVID-19 paid sick leave under the foregoing provisions of this Item 7.

j.    To the extent that an employee is eligible for paid sick leave in a jurisdiction with a law that cannot be waived in a collective bargaining agreement, the law of the jurisdiction shall apply in lieu of the provisions herein.

k.    An employee who is absent from work due to an Eligible COVID-19 Event will be reinstated to his/her original position on the production, provided that: (a) the

**EXHIBIT 9**

position continues to exist or the role has not been recast; and (b) if the absence was due to the employee's own COVID-19 status (*i.e.*, a positive test or symptoms) or the COVID-19 status of someone in the employee's household or with whom the employee had come into close contact, the employee satisfies the Producer's eligibility requirements for return to work; however, for continuity purposes, a Producer is not required to reinstate an employee on an episodic series or serial until work on the current episode has been completed. If the employee's absence exceeds fourteen (14) consecutive calendar days, the parties will discuss on a case-by-case basis, upon the request of the Producer, issues related to the individual's reinstatement.

m.   The Union shall waive COVID-19-related sick leave laws to the extent that such laws permit waiver in a collective bargaining agreement. The AMPTP and each of the Unions shall execute a letter agreement to provide:

"Reference is made to the COVID-19-related return to work agreement of the parties, dated September 21, 2020, in which the parties agreed to waive the application of all COVID-19-related paid sick leave laws for which waiver is permissible under a collective bargaining agreement.

"The Union expressly waives, to the full extent permitted by law, the application of the following to all employees employed under [*the applicable collective bargaining agreements of each Union*]: The City of Los Angeles Emergency Order regarding Supplemental Paid Leave Due to COVID-19 (issued April 7, 2020); the Los Angeles County COVID-19 Worker Protection Ordinance; and any other ordinance, statute or law requiring COVID-19-related paid sick leave that is hereafter enacted. It is understood that the Unions and the AMPTP shall memorialize any such waiver for any newly-enacted law by letter agreement."

n.   The payments in this temporary COVID-19 paid sick leave policy shall be available to employees in addition to any other leave the employees would receive under any applicable collective bargaining agreement. In the event an employee has an "Eligible COVID-19 Event" as defined in Item 7.c. above, the employee must use the temporary COVID-19 paid sick leave described in this Item 7 before any other leave available under the applicable collective bargaining agreement.

o.   The provisions of this temporary COVID-19 paid sick leave policy shall be in effect until the expiration of this Agreement.

8.   <u>Payment for Required Isolation or Self-Quarantine (Other than for an Eligible COVID-19 Event)</u>

This Item 8 applies after an employee has been engaged and the employee is required to isolate or self-quarantine at the request of the Producer (other than for an Eligible COVID-19 Event) and/or because the law of the jurisdiction where production is taking place requires travelers from outside the jurisdiction to self-quarantine, under the following circumstances:

**EXHIBIT 9**

prior to the commencement of an employee's work on a production; or

when an employee who has already commenced work travels to a production location where applicable law requires travelers from outside the jurisdiction to self-quarantine.

If the employee does not perform work at the direction of the Producer while in isolation or self-quarantine:

a.  The Producer may individually negotiate payment for time spent in isolation or self-quarantine with:

    i.   Directors employed on a theatrical motion picture, a pilot or a long-form television motion picture/long-form High Budget SVOD Program, or who are employed under Paragraph 10-109 of the Basic Agreement;

    ii.  Schedule F deal performers guaranteed $40,000 or more per television motion picture or High Budget SVOD Program or $80,000 or more per theatrical motion picture. Notwithstanding the foregoing, no payment is due for days spent in isolation or self-quarantine that are within the overall production period of a series contract performer whose guarantee meets one of the thresholds specified in Section 14(b)(1) or (2) of the SAG-AFTRA Television Agreement.[4]

    iii. Performers employed on a multi-part closed-end picture under Schedule F who are guaranteed $80,000 or more for the multi-part picture and $20,000 or more per part.

    iv.  IATSE employees employed in the jurisdiction of the IATSE Basic Agreement or from within the geographical jurisdictions of the IATSE Area Standards Agreement or IATSE New York Local Agreements (*i.e.*, Locals #52, #161, #764, #798 and USA 829) to perform work outside the limits of the United States, its territories and Canada.

b.  All other employees shall be paid for time spent in isolation or self-quarantine as set forth below, based on scale for the employee's job classification/applicable minimum.[5]

---

[4] The foregoing is not intended to preclude a series contract performer who enters into a contract on or after the effective date of this Agreement and whose guarantee meets one of the thresholds specified in Section 14(b)(1) or (2) from negotiating payment for time spent in isolation or self-quarantine as a better condition of employment.

[5] This provision does not alter the terms of any agreement entered into prior to the effective date of this Agreement regarding payment for time spent in isolation or self-quarantine under the circumstances covered by this Item 8.

**EXHIBIT 9**

i. <u>IATSE/Teamsters/Basic Crafts Unions</u>

(1) For each of the first five (5) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine:

    (A) Daily employees – payment for a minimum call.

    (B Hourly employees without a minimum call – payment for eight (8) hours.

    (C) Weekly employees – one-fifth (1/5) of the distant location weekly/on-call rate.

    (D) Employees whose rates are subject to individual negotiation under the collective bargaining agreement – *pro rata* daily rate.

(2) For each of the final two (2) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine:

    (A) Daily and weekly (other than "on-call") employees; hourly employees without a minimum call – four (4) hours of pay, plus pension and health/welfare contributions for eight (8) hours.

    (B) "On-Call" Employees – one-twelfth (1/12) of the weekly/on-call rate, plus pension and health/welfare contributions for seven (7) hours on the sixth (6th) day out of each seven (7) consecutive day period, or for eight (8) hours on the seventh (7th) day out of each seven (7) consecutive day period.

    (C) Employees whose rates are subject to individual negotiation under the collective bargaining agreement – one-half (½) of the *pro rata* daily rate, plus applicable pension and health/welfare contributions and contributions.

If the applicable collective bargaining agreement provides for a daily contribution rate, contributions shall be made at the daily rate for each of the sixth (6th) and seventh (7th) days out of each seven (7) consecutive day period. If the applicable collective bargaining agreement provides for a percentage contribution rate, contributions shall be calculated on the payment set forth above.

*Fringe benefits*: Such payments shall be subject only to health/welfare contributions, pension contributions and IAP/annuity contributions, if applicable. Such payments shall not be subject to vacation or unworked

**EXHIBIT 9**

holiday payments, nor any other fringe benefit contributions, except that paid sick leave for a daily employee employed under the Local #839 Agreement is inclusive of vacation and holiday pay.

ii.    DGA

(1)    Directors – one-fifth (1/5) of the weekly salary, or the daily rate for a Director who is engaged for daily employment as permitted under the Basic Agreement or FLTTA, for each of the first five (5) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine.

(2)    UPMs/Assistant Directors/Associate Directors employed under the Basic Agreement

(A)    Daily employees – one-fourth (1/4) of the distant location weekly rate for each of the first five (5) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine.

(B    Weekly employees – one-seventh (1/7) of the distant location weekly rate for each day in which the employee is in isolation or self-quarantine.

(3)    Associate Directors/Stage Managers employed under the FLTTA

(A)    Prime Time Dramatic

1)    Daily employees – one-fourth (1/4) of the distant location weekly rate for each of the first five (5) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine.

2)    Weekly employees – one-seventh (1/7) of the distant location weekly rate for each day in which the employee is in isolation or self-quarantine.

(B)    Other Than Prime Time Dramatic

1)    Daily – payment for eight (8) hours for each of the first five (5) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine.

2)    Weekly – one-fifth (1/5) of the weekly rate for each of the first five (5) days out of each seven (7)

3)

**EXHIBIT 9**

consecutive day period in which the employee is in isolation or self-quarantine; eight (8) hours at straight time for each of the final (2) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine.

Such payments shall be subject to pension and health contributions.

iii.   **SAG-AFTRA**

(1)   Performers – Schedule B weekly minimum (currently $3,575) for each seven (7) consecutive day period in which the employee is in isolation or self-quarantine (or *pro rata* for any period of less than seven (7) days).

The overall production period for a series contract performer whose guarantee does not meet one of the thresholds specified in Section 14(b)(1) or (2) of the Television Agreement shall be suspended during any period for which he/she receives payment for time spent in isolation or self-quarantine under this provision (*i.e.*, such days shall not count towards the performer's overall production period).

No payment is due if such days are within the overall production period of a series contract performer whose guarantee meets one of the thresholds specified in Section 14(b) (1) or (2) of the Television Agreement.[6]

(2)   Background actors – daily minimum for a background actor for each of the first five (5) days out of each seven (7) consecutive day period in which the employee is in isolation or self-quarantine.

Such payments shall be subject to pension and health contributions, but shall not impact any calculation of residuals.

If the employee performs work at the direction of the Producer while in isolation or self-quarantine, he/she shall instead be paid pursuant to his/her contract of employment for any day on which the employee performs such work.

---

[6] The foregoing is not intended to preclude a series contract performer who enters into a contract on or after the effective date of this Agreement and whose guarantee meets one of the thresholds specified in Section 14(b)(1) or (2) from negotiating payment for time spent in isolation or self-quarantine as a better condition of employment.

**EXHIBIT 9**

9. **Meals and Individual Packaging**

Meals and snacks will be served in individually packaged or wrapped portions. Communal "buffet style" food service, including salad bars, trays of food, or any food service that requires sharing of utensils such as serving spoons or tongs, will not be permitted. Compliance with the foregoing satisfies any obligations under the collective bargaining agreements to provide a meal to employees. Producer shall not be required to provide employees with a hot meal.

10. **Electronic Receipt of Documents**

To the extent the Producer implements electronic documents in lieu of paper documents, employees shall accept e-delivery of and provide e-signatures for the following items: (1) start paperwork; (2) time cards; (3) deal memos; (4) direct deposit of payroll (where Union consent to direct deposit is not permissible, Producers shall be permitted to mail checks); (5) extras vouchers; (6) fitting vouchers; (7) audition sign-in sheets and (8) SAG-AFTRA Exhibit Gs (one electronic Exhibit G may be sent to all performers). If an employee does not possess or have access to a device or technology which permits receipt and transmission of electronic documents, the Producer will either provide the employee with a hard copy of the document or make other arrangements for the employee to receive and sign electronic documents. Producer agrees to meet with each of the Unions during the term of this Agreement to discuss measures for ensuring the proper protection of personal information contained in the foregoing documents and other related privacy concerns.

11. **Contact Tracing**

While the employees are on the job site, Producers may require that employees participate in systems that enable contact tracing, such as use of a "punch card" system to record the employee's location throughout the day or by means of electronic devices (*e.g.*, phone "apps" or wearable electronic devices that track the movement or location of a person or which detect when a person wearing the device comes into close contact with another person wearing the device). Producers may require employees to sign documentation consenting to the use of such electronic devices in contact tracing.

In the event that a Producer uses electronic devices for contact tracing, it may access information collected from those devices only for purposes of tracing individuals that the employee has been in contact with during working hours when there has been a COVID-19-related event, or for purposes of managing and enforcing social distancing protocols.

12. **Consent to Producers' COVID-19 Policies and Procedures**

Each Producer has developed detailed policies and procedures to address COVID-19 in the workplace. To the extent those policies or procedures conflict with the provisions of this Agreement, this Agreement shall prevail as it relates to employees covered by this Agreement.

**EXHIBIT 9**

The Producer may require employees to acknowledge receipt of the Producer's COVID-19 policies and procedures and to adhere to such policies and procedures.

Union representatives agree to cooperate and comply with all Producer policies and procedures with respect to testing and other health screening procedures for Zone A or Zone B employees, as applicable. The Union shall be responsible for ensuring that any representatives exercising their right to visit the workplace are in compliance with testing requirements prior to visiting the workplace.

Each Producer shall provide the Union with a copy of its COVID-19 policies and procedures.

13. **All Budget Thresholds Exclude COVID-19-Related Expenses**

Under certain provisions of the collective bargaining agreements (including the IATSE and DGA Low Budget Agreements), terms and conditions of employment are linked to the budget of a program. The parties have discussed the increased costs that productions will incur to implement various health and safety protocols related to the COVID-19 pandemic. Because those unprecedented costs are additive to the standard production costs on which the parties negotiated the budget tiers that determine terms and conditions of employment, the parties agree that the following costs shall be excluded from consideration of whether a program falls within a given budget tier: health screening (including testing, health assessment surveys and temperature checks), personal protective equipment, salaries of COVID-19 compliance monitor(s) performing only COVID-19-related duties, COVID-19-related cleaning costs in excess of ordinary or usual cleaning costs, portable hand washing stations (unless they would have been necessary in the absence of COVID-19), additional bathroom units, costs of lodging and per diem for employees who are required to isolate or self-quarantine and payments made to employees during any self-isolation or quarantine (other than those due to an "Eligible COVID-19 Event," as defined in Item 7.c. above).

14. **Work from Home**

The following applies when a Producer requires an employee to work remotely from home:

a.   If an employee does not have equipment necessary to work remotely from home and the Producer does not provide such equipment, the employee shall submit a request to the Producer for purchase of the necessary equipment. Producer shall reimburse the employee for any pre-approved purchases after the employee submits receipts or other appropriate proof of purchase.

b.   Producer shall provide an employee with any technology training that it determines is necessary in order for the employee to work remotely from home.

c.   Producer shall reimburse any necessary and reasonable costs that an employee incurs as a direct consequence of working remotely from home, provided that the

Producer has approved such expenses in advance and the employee submits appropriate proof of the expense.

15. **Dispute Resolution/Grievance and Arbitration**

Any dispute arising out of the provisions of this Agreement may be referred to the grievance and arbitration procedures in the applicable collective bargaining agreement.

16. **Conflict of Law**

In the event that any of the terms or conditions of this Agreement are contrary to or unenforceable by reason of any law or governmental decision, ruling or regulation, such terms or conditions shall be deemed to be severed from this Agreement, and the illegality or unenforceability thereof shall not in any manner affect or impair any other terms or conditions of this Agreement.

17. **Industry-Wide Labor-Management Safety Committee Task Force White Paper**

The parties incorporate certain of the guiding principles and the following recommendations of the Industry-Wide Labor-Management Safety Committee Task Force White Paper, which are reproduced in Exhibit A to this Agreement:

a.   Infection Control – Hand Hygiene
b.   Infection Control – Disinfection and Maintenance [*reference to "COVID-19 Compliance Officer" changed to "COVID-19 Compliance Supervisor or his/her designee."*]
c.   Infection Control – Food and Beverages
d.   Infection Control – General Infection Prevention Issues [*note addition of clarifying footnote 1 on p. 44*]
e.   Protecting and Supporting Cast and Crew Health and Safety – Development of Symptoms [*reference to "COVID-19 Compliance Officer" changed to "COVID-19 Compliance Supervisor."*]
f.   Physical Distancing – Meetings
g.   Physical Distancing – Writers' Rooms
h.   Physical Distancing – Audiences [*modified to reference jurisdictions which prohibit live audiences*]
i.   Physical Distancing – Working Remotely (Telecommuting)
j.   Physical Distancing – Shared Workspaces
k.   Training and Education
l.   Unique Production-Specific Concerns – Special Considerations for Cast and Crew Working in Close Proximity to Performers
m.   Unique Production-Specific Concerns – Special Considerations for Performer [*note addition of clarifying footnote 2 on p. 48 and footnote 3 on p. 49*]
n.   Unique Production-Specific Concerns – Transportation
o.   Unique Production-Specific Concerns – Special Considerations for Travel
p.

**EXHIBIT 9**

q.      Unique Production-Specific Concerns – Special Considerations for Filming on Location

**DGA Items**

18.    **One Director To A Film on Episodic Television**

The parties recognize that situations may arise in which the original Director of an episode is unavailable due to reasons related to COVID-19 (*e.g.*, the original Director is or becomes ill, a location becomes available after being closed due to COVID-19 when the original Director is unavailable, or scenes must be shot at a time when a jurisdiction eases restrictions on crowd or intimate scenes and the original Director is unavailable at such time). To minimize the possibility of introducing a new employee who may be infected with COVID-19 to the production, the Guild and the Producer shall enter into good faith discussions to allow someone who is already engaged on the production to direct scenes for another Director's episode when such situations arise.

19.    **Temporary Upgrade of an Assistant Director**

Producer may temporarily upgrade an Assistant Director to a higher classification to replace an employee who is absent due to an Eligible COVID-19 Event (as defined in Item 7.c. above for purposes of temporary COVID-19 paid sick leave), even if he/she is not on the Qualification List for such higher classification. The Producer shall notify the Guild as soon as practicable after it becomes aware that a replacement is necessary, so that the parties can discuss a plan for the return of the absent employee or a replacement from the applicable Qualification List.

20.    **Electronic Transmissions**

*The following represents the parties' understanding regarding electronic transmission of images and/or sound under Paragraph 7-1505 of the DGA Basic Agreement during the term of this temporary Agreement to address return to work issues associated with COVID-19. Upon the expiration of this temporary Agreement, the parties agree that the terms of Basic Agreement Paragraph 7-1505 shall apply, and that the parties shall have three months from the expiration of this temporary Agreement to negotiate the terms and best practices referred to in Basic Agreement subparagraph 7-1505(c).*

"Due to the unique nature of the COVID-19 pandemic, the use of electronic transmission of images and/or sound from the set, stage or control booth may be necessary to reduce the number of people that are physically present on the set or stage or in the control booth, so as to allow for appropriate physical distancing.

"Accordingly, the parties acknowledge that the Producer may make images and/or sound of rehearsals and/or takes of scenes available via electronic transmission to one or more locations near and/or outside the production area to persons who, if not for physical

distancing necessitated by COVID-19, would have been present on the set or stage or in the control booth, including:

"(i)     the Director of Photography and Sound Mixer;

"(ii)    Assistant Directors;

"(iii)   Hair Stylists, Make-up Artists and Costumers;

"(iv)    parents, guardians, teachers, social workers, welfare workers and other people responsible for monitoring minor performers;

"(v)     union representatives; and

"(vi)    other employees of the Employer or visitors to set who would have had a legitimate business reason to be present on set (*e.g.*, writers, executive producers, network executives).

"It is understood that the use of such electronic transmission for purposes of COVID-19 prevention shall not expand the number of people who would have had access to the set, stage or control booth, if not for the physical distancing requirements necessitated by COVID-19. With respect to rehearsals and/or takes of intimate scenes, access to images and/or sounds via electronic transmission shall be limited to those who would have been physically present on set or who would have had access to monitors during such scenes, if not for the physical distancing necessitated by COVID-19.

"Such electronic transmission shall be implemented in consultation with the Director. If the electronic transmission is to a location outside the production area, the Employer shall notify the Director of the name and title of the individual(s) receiving the electronic transmission. If more than one such individual has creative notes for the Director, the notes should be delivered to the Director by a single person designated by the Employer, or, alternatively, the individuals should coordinate with each other and the Director to deliver the notes together. Ideally, notes should be reserved until after the Director has had a chance to make initial adjustments with performers, and should be succinct and immediate, if possible.

"It is understood that the parties may make separate arrangements for use of electronic transmissions on multi-camera programs in order to accommodate the continuation of normal business practices on such programs, while also providing for physical distancing necessitated by COVID-19."

21.   **"On or About" Start Dates**

The DGA waives the obligation in Paragraph 4-103(c) of the Basic Agreement and Article 14.D.3. of the FLTTA to provide a specific date when postponing a Director's "on or about" start date for COVID-19-related reasons, so that the Employer and Director may

**EXHIBIT 9**

agree to move the "on or about" start date to a future unspecified date. A Producer and the DGA may also discuss the possibility of being able to move the Director's start date more than once when necessitated by reasons related to COVID-19.

If the Producer and Director are ultimately unable to agree on a new "on or about" start date for the motion picture or program on which the Director is booked, the Producer, upon mutual agreement by the Director, may attempt to book the Director on a comparable assignment which has minimum terms and conditions no less than those of the booked episode, and this new assignment shall satisfy the Producer's pay-or-play commitment.

The employment on a comparable assignment must commence within one year of the originally scheduled start date of the episode for which the parties could not agree on a new start date. In the event no agreement can be reached on scheduling a comparable assignment, the Director shall be paid the episodic fee for the episode for which the parties could not agree on a new start date.

In the event the Producer chooses to pay the Director's salary or a portion thereof in advance of the Director's start date, such payment may be credited against compensation for future services performed for the Producer, provided that the Producer notifies the DGA and the Producer and Director execute a confirming agreement.

22.   **Substituting Director**

Without prejudice to either party's position on the application of Paragraph 3-102 or the double-asterisked provision of Paragraph 10-101 of the Basic Agreement, the parties agree to the following when a Director is replaced due to the Director's Eligible COVID-19 Event:

a.   Theatrical motion picture – The substituting Director shall only be guaranteed the greater of the number of guaranteed days remaining under Paragraph 3-101 or the number of days actually remaining on the shooting schedule at the time such substituting Director begins the assignment. In addition, the substituting Director shall receive no less than one hundred fifty percent (150%) of minimum compensation for the work performed. However, there shall be no compounding of premium pay to such substituting Director for work performed on a holiday or for the sixth or seventh day worked in the Director's workweek.

b.   Television motion picture/High Budget SVOD Program – The substituting Director shall only be guaranteed the greater of the number of guaranteed shooting days remaining under Paragraph 10-101 (or Paragraph D. of Sideletter No. 35 for a High Budget SVOD Program) or the number of days actually remaining on the shooting schedule at the time such substituting Director begins the assignment. In addition, the substituting Director shall be guaranteed payment for prep time as follows: the guaranteed prep time shall bear the same relation to the number of days remaining on the shooting schedule at the time the substituting Director

c.

**EXHIBIT 9**

begins the assignment as the maximum preparation days provided in Paragraph 10-101 (or Paragraph D. of Sideletter No. 35 for a High Budget SVOD Program) for a motion picture of that type bears to the maximum number of shooting days provided in Paragraph 10-101 (or Paragraph D. of Sideletter No. 35 for a High Budget SVOD Program) for a motion picture of that type.

23.  **Employment of DGA-Represented Individuals to Work Under the COVID-19 Compliance Supervisor's Supervision**

An employee previously employed under the DGA Basic Agreement or FLTTA who is hired to perform work covered under either of those agreements and to assist the COVID-19 Compliance Supervisor in carrying out his/her duties under Item 4.c. above shall be covered as a Second Second Assistant Director, an Additional Second Assistant Director or Stage Manager, as applicable.

The Employer shall submit a deal memo reflecting the category under which the employee is hired and indicating that the individual is employed as part of the COVID-19 compliance team. There shall be no penalty for an inadvertent failure to indicate that an employee is part of the COVID-19 compliance team on the deal memo.

Such employee cannot be upgraded pursuant to Item 19 above ("Temporary Upgrade of an Assistant Director"), shall not share in any residuals generated from the project and shall not be entitled to mandatory DGA screen credit.

**IATSE Item**

24.  **Stand-by or Relay Calls**: Producer shall have the ability to issue a stand-by call or relay call if a production exigency related to COVID-19 arises.

**SAG-AFTRA Items**

25.  **Consecutive Employment/Span**:

a.   *Testing:* Time spent undergoing COVID-19 testing and awaiting the results of such testing does not start span for series contract performers whose guarantees do not meet one of the thresholds specified in Section 14(b) of the SAG-AFTRA Television Agreement (*i.e.*, $20,000 per episode, $100,000 per series when such series is one of a number of series presented in a combined series format or $150,000 for a 13 episode guarantee), nor consecutive days of employment for performers other than series contract performers.

b.   *Quarantine*: If a performer is placed in quarantine prior to the start of production due to COVID-19, such quarantine period does not start span for series contract performers whose guarantees do not meet one of the thresholds specified in Section 14(b) of the SAG-AFTRA Television Agreement (*i.e.*, $20,000 per episode, $100,000 per series when such series is one of a number of series

c.

**EXHIBIT 9**

presented in a combined series format or $150,000 for a 13 episode guarantee), nor consecutive days of employment for performers other than series contract performers.

d.      The Union shall not unreasonably deny requests to waive payment of intervening days when a Producer recalls a daily or weekly performer following an interruption in the performer's work due to reasons related to COVID-19, provided that the Producer gives the performer a specific recall date which is at least five (5) days after the date of the interruption, and the performer is not on overnight location.

e.      In the event that a production is suspended due to reasons related to COVID-19, the Producer may renegotiate the performer's personal services agreement for the production so that the performer can be recalled (subject to his/her professional availability) without payment for the intervening days, in lieu of terminating the performer under Section 61 of the Television Agreement or the "Illness of Performer (Suspension of Salary and Termination)" or "Emergency Suspension or Termination" provisions in the Codified Basic Agreement.

26.     **Studio Teachers - Remote Instruction**: Amend SAG-AFTRA Codified Basic Agreement Section 50.D. to provide that studio teachers may instruct minors remotely to the extent permitted by law or the applicable governmental authority.

27.     **Voiceover/ADR/Looping**

The following provisions are applicable when recording is performed in facilities other than in personal or home studios:

a.      Producer will consider in good faith the request of any voiceover/ADR/Looping performer to work from home when circumstances permit. Producer's decision shall be final.

b.      The protocols to be followed for sanitizing voiceover and audio booths, and the equipment contained in those booths, are set forth in the section entitled, "INFECTION CONTROL – DISINFECTION AND MAINTENANCE," in Exhibit A of this Agreement. Voiceover and audio booths and the equipment within those booths shall be cleaned between each use by different performers.

c.      Performers may use their own individual equipment, including but not limited to headphones, pop filters, tablets, etc., upon approval by the Producer.

d.      Confined spaces where performers vocalize, such as voiceover and recording booths, shall have 100% exchange of air by ventilation or air filtration between each user, as determined by reference to the manufacturer's specifications for the ventilation or air filtration system in use in the confined space. Ventilation may be conducted with HVAC systems that conduct air exchange with outside air, or

e.

**EXHIBIT 9**

which filter recirculated air and are regularly inspected and equipped with MERV 13 or higher rated filters (i.e., filtration of particles as small as 0.3 microns, and minimum of 90% filtration of particles larger than 1 micron).  In the alternative, Producer may conduct air filtration using portable HEPA filters in accordance with the manufacturer's specifications.

f.    When practical to do so and subject to the Producer's security and/or confidentiality concerns, scripts and/or music will be provided to the performer in digital format when the performer indicates to the Producer a preference for that format.  If a performer expresses a preference for a paper copy of materials, or if it is not practical to provide the scripts and/or music in digital format, single-use individual paper copies will be provided.

g.    A performer who is alone in a space (e.g., a recording booth) while recording voiceover, ADR or looping sessions, and who is not required to come within six (6) feet of other individuals at the location where work is to be performed for longer than fifteen (15) minutes, is not required to undergo COVID-19 testing.

Multiple performers present in the same space (e.g., a recording booth) while recording voiceover, ADR or looping sessions are subject to the testing protocols for "Zone A" employees set forth in Item 2.a., "Health Screening – Testing," of this Agreement.

h.    Producers and SAG-AFTRA will meet as soon as practicable after the effective date of this Agreement to discuss additional protocols that may be applicable to group voiceover/ADR/looping and singing.

**ON BEHALF OF THE PRODUCERS LISTED IN THE PREAMBLE REPRESENTED BY THE ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS**

By: _____        Date: _____
        Carol A. Lombardini

**ON BEHALF OF THE DIRECTORS GUILD OF AMERICA, INC.**

By: _____        Date: _____
        Russell Hollander

**EXHIBIT 9**

**ON BEHALF OF THE INTERNATIONAL ALLIANCE OF THEATRICAL STAGE
EMPLOYEES AND MOVING PICTURE TECHNICIANS, ARTISTS AND ALLIED
CRAFTS OF THE UNITED STATES, ITS TERRITORIES AND CANADA, AND ITS
LOCAL UNIONS IN NORTH AMERICA**

By: _____          Date: _____
    Matthew D. Loeb

**ON BEHALF OF SCREEN ACTORS GUILD-AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS**

By: _____          Date: _____
    David P. White

**ON BEHALF OF THE BASIC CRAFTS UNIONS LISTED IN THE PREAMBLE**

By: _____          Date: _____
    Steve Dayan

**ON BEHALF OF THEATRICAL DRIVERS AND HELPERS, LOCAL UNION #817,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

By: _____          Date: _____
    Thomas O'Donnell

**EXHIBIT 9**

## EXHIBIT A

## GUIDING PRINCIPLES

- All state, local, and federal (CDC) public health guidelines will be followed.

- Medical expertise must always guide decision making with respect to testing, contact tracing, symptom screening and similar protocols that raise medical questions.

- The judgment of Department Heads and their crews, in collaboration with Unit Production Managers (UPMs) and Assistant Directors (ADs), will be considered when structural and logistical changes are made to accommodate the new working practices.

- Adequate staffing and space for physical distancing is essential for an effective health and safety plan.

- Resuming production during this time may be highly stressful and cause anxiety. The implementation of mental health resources to support the wellness of those participating in a production may be necessary. Options could include:
  - o    Emotional support hotline
  - o    Telemedical health and behavioral health resources
  - o    Mindfulness training; and
  - o    Provision of online tools and resources.

- Cast and crew are encouraged to report problems, ask questions and suggest solutions to enhance the safety and productivity of the workspaces.

- The CDC advises that those over age 65 and those with co-morbidities consult with their healthcare providers regarding the risks of COVID-19.

- Given the dynamic and evolving nature of the COVID-19 pandemic, these interim guidelines will likely need to be modified and adapted as circumstances change.

## INFECTION CONTROL – HAND HYGIENE

Hand hygiene is a cornerstone of infection prevention and will need to be practiced widely in entertainment industry work environments. Given the potential concern about transmission of COVID-19 via contact, enhanced hand hygiene measures are critical. Hand washing with soap and water is considered more effective than hand sanitizer in preventing the spread of COVID-19.

The Task Force recommends the following regarding hand hygiene:

- Cast and crew should avoid touching their eyes, nose and mouth.
-

**EXHIBIT 9**

- Handwashing facilities with running water, soap and paper towels (dispensed using a non-touch system, if possible), adequate for the number of cast and crew, shall be available and accessible from the first day of work.

- Handwashing facilities shall be kept clean and well-stocked.

- When production is taking place where handwashing facilities are not readily available, mobile handwashing stations shall be provided.

- Stations with alcohol-based hand rub ("hand sanitizer") with at least 60% alcohol shall be strategically placed around work areas and readily accessible.

- Sufficient supplies of hand sanitizer shall be stocked and maintained.

- Cast and crew shall be provided with pocket-sized hand sanitizer that can be used if hand washing or sanitizing stations are not available, such as in vehicles or remote locations.

- Cast and crew should be trained on hand hygiene practices (washing for a minimum of 20 seconds of duration, scrubbing all surfaces).

- Production should encourage and promote opportunities for cast and crew to practice hand hygiene and perform disinfectant wipedowns of high-touch areas.

- Hands should be washed or sanitized:
  - Upon arriving at the job site;
  - After blowing one's nose, coughing, or sneezing;
  - After using the restroom;
  - Before and after eating or drinking;
  - After contact with animals or pets;
  - After handling shared equipment or objects;
  - After cleaning or disinfecting equipment, tools or workspaces; and
  - At other appropriate times throughout the workday.
  - Signage should be posted prominently with instructions on how to stop the spread of COVID-19, including hand hygiene and PPE instructions.

## INFECTION CONTROL – DISINFECTION AND MAINTENANCE

Heightened cleaning and disinfection should be practiced. Those responsible for performing cleaning should adhere to the following recommendations and any other guidance issued by public health authorities with respect to cleaning practices.

- Appropriate, EPA-registered disinfecting methods and supplies with a claim against SARS-CoV-2 shall be available in all workspaces.
- 

**EXHIBIT 9**

- High-touch surfaces shall be wiped down periodically with appropriate, EPA-registered disinfectant, following the disinfectant manufacturer's instructions (e.g., safety requirements, protective equipment, concentration, contact time). Examples of high-touch surfaces are tables, doorknobs, countertops, phones, faucets, etc.

- Productions and a COVID-19 Compliance Supervisor or his/her designee (discussed in Item 4 of this Agreement) will work with all departments to review and implement specific plans for disinfection of department-specific equipment. Departments will review specific workflows and identify ways to ensure disinfection of equipment and physical distancing (e.g., cleaning of camera dollies, use of remote focus devices, lights).

- All workspaces should be cleaned with increased frequency, with an emphasis on high-touch surfaces.

- Whenever possible, minimize use of shared office equipment such as copiers and fax machines. When use of such equipment is unavoidable, hand hygiene should be performed after use.

- Manufacturer's cleaning instructions should be followed for cleaning of sensitive equipment such as electronics.

- Production on set and work off set should designate specific individuals to perform high-touch wipedown, with an emphasis on shared spaces and equipment.

- Shared workspaces should be cleaned daily with an emphasis on high-touch surfaces, including but not limited to production sets, studios, dressing rooms, hair and make-up stations, trailers, on- and off-production offices, break areas, shops and eating/meal areas.

- Dedicated cleaning crews should clean common spaces at appropriate daily intervals.

*Props, Costumes, Accessories, Wigs, and Other Specialty Items*

Due to inability to clean many of these objects, special care should be taken.

- As many of these items have unique cleaning requirements, those responsible for cleaning such items will do so in the customary manner.

- Hand props (other than those with unique cleaning requirements) shall be cleaned and disinfected before and after use.

- Hands shall be cleaned before and after handling props, accessories and other items.

*Personal Equipment*

- Personal equipment (such as tools, headsets, microphones and radios) shall be cleaned and disinfected before being issued and then at least once per day. Manufacturer's

-

**EXHIBIT 9**

suggested cleaning instructions should be followed for electronics and other sensitive items.

• Equipment such as radios/walkie-talkies will be issued to a single cast or crew member and used exclusively by that cast or crew member for the duration of production.

• Personal items or equipment that must be shared between members of the cast and/or crew must be wiped down with disinfectant between use and hand hygiene shall be performed after handling.

*Vehicles*

• High-touch surfaces in vehicles (e.g., steering wheels, controls, seatbelts, door handles, arm rests) shall be cleaned at least once per day and prior to a change in operator or passenger.

*Paper*

• Whenever possible, use of paper should be minimized. Alternatives such as electronic scripts and electronic sign-in/out should be explored.

• Consider alternatives to petty cash to minimize the need to handle paper money, such as purchase cards.

• When paper scripts are unavoidable, they should be assigned to a specific individual, clearly labeled with their name, and not shared between others.

• Crew lists, call sheets, production reports and other similar documents should be electronic whenever possible.

• When use of shared paperwork is required, such as blueprints or editing binders, hand hygiene before and after handling is recommended.

## INFECTION CONTROL – FOOD AND BEVERAGES

COVID-19 is unlikely to be spread through food or beverages; however, catering, crafts service and eating within workspaces present several unique challenges.

• Those responsible for preparing and distributing food must clean their hands with soap and water or hand sanitizer prior to beginning food preparation and/or distribution and regularly thereafter.

• All local public health regulations regarding preparing and distributing food must be followed, including regulations regarding the use of appropriate food service PPE (hair nets, gloves, and face coverings), safe food temperatures, etc., and all personnel

•

**EXHIBIT 9**

responsible for the preparing and/or distribution of food must be properly certified to do so.

- As face coverings cannot be worn while eating, adequate eating space must be provided to ensure physical distancing can be maintained during meal periods.

- Handwashing facilities and/or hand sanitizer must be readily accessible at the entrance of any designated eating area and shall be used when entering and leaving the area.

- Meal times should be staggered in a manner designed to avoid the gathering of large groups in the same location at the same time.

- All eating surfaces shall be cleaned and disinfected before and after use.

- Eliminate communal "buffet style" food service, including salad bars, trays of food, or any food service that requires sharing of utensils such as serving spoons or tongs.

- Meals and snacks should be served in individually packaged or wrapped portions. Avoid shared communal trays or bowls.

- Eating utensils should be disposable and individually wrapped.

- Cast and crew should not leave the job site to obtain food during the course of the workday.

- Off-production offices, meeting rooms and other workspaces should have infection control protocols for use, especially when used for providing impromptu meals, snacks and coffee. Likewise, break rooms, microwaves, dishes and food deliveries will require regular cleaning and physical distancing.

- If food is to be delivered to the job site, one or more individual(s) should be designated to receive the delivery. Appropriate PPE should be worn when interacting with the delivery person and hand hygiene should be performed after handling the delivery. Cast and crew who bring their own food are encouraged to bring food that does not require refrigeration or heating/microwaving.

- Consider options for cast and crew to place orders ahead of time to minimize the amount of time they must wait in line. Consider addition of plexiglass (or similar) barriers between servers and cast and crew.

- Avoid using or sharing items such as menus or condiments such as salt and pepper shakers. These items should be disposable and single serve.

- 

**EXHIBIT 9**

*Beverages*

- Drinks should be individually packaged or, if drinks are to be dispensed from a water station, soda fountain, coffee machine or similar equipment, receptacles should not come into contact with dispensers.

## INFECTION CONTROL – GENERAL INFECTION PREVENTION ISSUES

- Limit the duration of workdays and excessive consecutive workdays whenever possible.

- Physical contact should be avoided, including shaking hands, "high fives," fist or elbow bumps, or hugging. Physical contact related to performers is discussed below.

- Visitors to set should be limited unless absolutely necessary.[1] If visitors are provided access, they will be subject to the same guidance as cast and crew, including the need for symptom screening and PPE requirements.

- Union representatives exercising their rights to visit workspaces will be subject to the safety guidelines required of a visitor.

- All cast and crew should avoid touching their eyes, nose or mouth.

- In indoor spaces, ventilation systems and other measures should be used to increase circulation of outdoor air as much as possible (e.g., by opening windows and doors, using fans and other methods).

- Stagger cast and crew call and wrap times to limit the number of individuals arriving to and departing from work simultaneously.

- In the course of performing their duties, various cast and crew members may enter retail establishments during the workday. Applicable public health guidance should be followed, including use of face coverings. They should carry hand sanitizer and practice hand hygiene before entering retail establishments and after exiting.

## PROTECTING AND SUPPORTING CAST AND CREW HEALTH AND SAFETY – DEVELOPMENT OF SYMPTOMS

- Cast and crew are expected to immediately report to a designated person or persons (such as the COVID-19 Compliance Supervisor or such other person designated by the Producer) if they are experiencing, or a member of their household is experiencing,

---

[1] The parties agree that this means the individuals who have no business purpose for being on set should not visit the set.

72   **EXHIBIT 9**

symptoms of COVID-19. If a cast or crew member is experiencing symptoms or has come into close contact with someone who has tested positive for COVID-19 either on or off site, they must report to their employer and follow the employer's contact tracing guidelines.

- If a cast or crew member develops symptoms of COVID-19 when off site, they must not go to work and should immediately contact their healthcare provider. Anyone who reports to work with symptoms of COVID-19 will be instructed to return home and contact their healthcare provider.

- Cast and crew must be notified if they have been exposed to an individual who has exhibited symptoms of COVID-19 or who has tested positive for COVID-19.

## PHYSICAL DISTANCING

Limiting face-to-face contact with others is the best way to reduce the spread of COVID-19. Cast and crew must practice physical distancing whenever possible. Physical distancing involves maintaining a distance of at least 6 feet from any other person at all times, except when doing so is incompatible with one's job duties (see below). Cast and crew should avoid congregating in groups. When practical, separate work locations into zones to facilitate physical distancing. Visible physical indicators (e.g., cones, duct tape or signage) marking 6 feet of distance should be placed in areas where people must congregate, such as crafts service, eating/meal areas, make-up and costume trailers.

*Meetings*

- Use phones, videoconferencing or similar technologies for meetings whenever possible. Avoid people gathering around a computer to watch together. Consider virtual production meetings whenever feasible.

*Writers' Rooms*

- Whenever possible, move to virtual writers' rooms.
- When virtual writers' rooms are not possible, maintain 6 feet of distance, use face coverings, and perform hand hygiene before and after the meeting. Minimize use of paper.

*Audiences*

- At this time, the use of live audiences is discouraged and, in some jurisdictions, prohibited. On a case-by-case basis, live audiences may be used as long as audience members

  - Wear face coverings at all times
  -

**EXHIBIT 9**

- Maintain 6 feet of physical distance, including while waiting in line and sitting in a studio; and

- Undergo symptom screening on entry.

- An appropriate physical separation shall be maintained at all times between performers working without PPE and audience members. Medical professionals shall be consulted to determine the nature of the physical separation required for the safety of the performer in such situations, including additional physical distance or physical barriers (e.g., plexiglass walls).

*Working Remotely (Telecommuting)*

- On a temporary basis and without diminishing work opportunities, consider remote work/telecommuting opportunities for cast and crew. This should only apply to those who can perform their job duties effectively while working remotely/telecommuting.

*Shared Workspaces*

- To the extent possible, reduce crowding of all shared workspaces (e.g., production offices and shops) with a goal of keeping people 6 feet apart.

- In control rooms, editing rooms and other small spaces, if physical distancing cannot be maintained, all individuals must wear face coverings and should practice hand hygiene.

## TRAINING AND EDUCATION

- The Task Force recommends that training in the employer's COVID-19 plan to reduce infection risk be mandatory on or before the first day of employment.

- All employees should be educated about the signs and symptoms of COVID-19 as part of their training. People with COVID-19 have reported a wide range of symptoms, ranging from mild to severe. Signs and symptoms include the following:
  - Fever
  - Cough
  - Shortness of breath or difficulty breathing
  - Chills
  - Repeated shaking with chills
  - Muscle pain
  - Headache
  - Sore throat
  - New loss of taste or smell
  -

- All employees should receive dedicated training on the following topics:
  - PPE, with a focus on safe donning and doffing
  - Hand washing, including proper techniques
  - Environmental cleaning and disinfection, including high-touch wipedown
  - Policies and procedures related to COVID-19 on set or in offices
  - Psychological impact of the crisis
  - Protecting yourself at home
  - Preventing cross-contamination

- Post signage in all production workspaces where production activities occur, reinforcing training principles.

## UNIQUE PRODUCTION-SPECIFIC CONCERNS – SPECIAL CONSIDERATIONS FOR CAST AND CREW WORKING IN CLOSE PROXIMITY TO PERFORMERS

The work of some cast and crew members (e.g., hair stylists, make-up artists, costume designers, costumers, wardrobe department personnel, sound technicians, property persons, studio teachers and special effects technicians, etc.) may not be possible while maintaining physical distancing from others. The performers with whom they work may not be able to wear face coverings at all times, for example when make-up is being applied. Testing, contact tracing and task-specific controls such as the following shall be in place:

- Alter workspaces to permit physical distancing.
- Control the entrants to trailers and other workspaces.
- Allow sufficient work time to follow safety protocols.
- Cast and crew in close proximity must wear a face mask and/or face shield at all times and perform hand hygiene before and after the encounter.
- Additional protocols must be established before work of this nature could resume.

## UNIQUE PRODUCTION-SPECIFIC CONCERNS – SPECIAL CONSIDERATIONS FOR PERFORMERS

The work of performers will frequently put them in close (less than 6 feet) contact with other performers or cast and crew including, for example, hair stylists, make-up artists, stunt coordinators, costumers and wardrobe personnel. Face coverings/masks may not be practical during many of these activities. Additionally, certain activities such as fight scenes or intimate scenes increase the risk of transmission.

- Whenever possible, performers shall practice physical distancing.

- When maintaining physical distancing is not possible (e.g., between a performer and make-up artist) and the performer cannot wear appropriate PPE, contact must be kept to the shortest amount of time possible, and the other cast or crew member must wear appropriate PPE and observe hand hygiene practices.

- 

**EXHIBIT 9**

- The number of people involved in close proximity with a performer should be kept to a minimum whenever possible. If a performer requires work by more than one make-up artist/hairstylist, make-up artists/hairstylists should observe appropriate PPE requirements, and both performer and make-up artist/hairstylist should observe hand hygiene practices immediately after completing the task.

- Consider measures to minimize scenes with close contact between performers, such as amending scripts or use of digital effects.

- Stand-ins should wear face coverings even if the performer they are standing in for may not.

- When possible, adjust shooting schedules to minimize the amount of back-and-forth travel needed by performers.

- Visitors should be limited unless their presence is absolutely necessary.[2] If visitors must come, they will be subject to the same guidance as cast and crew, including, but not limited to, symptom screening and/or temperature screening, and PPE requirements.

- When performers are in a holding area, waiting to be used in a production, employers and performers must adhere to the recommendations outlined herein, including recommendations regarding physical distancing and the use of PPE.

*Personal Protective Equipment for Performers*

- When it is possible to do so consistent with their job duties, performers shall wear appropriate PPE.

- When wearing PPE is not possible, such as when a scene is being filmed or after make-up has been applied, the number of people with whom the performer is in close contact shall be minimized.

- As soon as possible after filming a scene, the performers shall put on their PPE and/or physically distance themselves.

*Casting and Auditions*

- Casting should be conducted virtually via self-tape, online video conference, or other applicable technology whenever possible.

- If that is not feasible, or for any additional calls or live sessions necessary, there must be a sufficient space large enough to accommodate 6 feet physical distancing in all directions.

- 

---

[2] The parties agree that this means that individuals who have no business purpose for being on set should not visit the set.

**EXHIBIT 9**

- If performers will not be wearing PPE during an audition, a plexiglass partition or similar barrier between the performers and those observing the audition shall be provided by the employer and used and cleaned between performances along with any furniture, props etc.

- If no barrier is present, increase the physical space between those observing to those auditioning beyond the 6 feet physical distancing standard.

- No more than one individual auditioning at a time except for legitimate pairs (e.g., household members, domestic partners, roommates, living together for a minimum of 14 days or more prior to the audition).

*Minors*

As minors may have difficulty adhering to physical distancing, wearing PPE, and practicing hand hygiene, when not working, they should be relocated to a secure off-set location to the extent possible.

- Extra personnel on set with a minor are strongly discouraged and should be limited to a studio teacher and one guardian only.

- Visitors should be limited unless their presence is absolutely necessary.[3] If visitors must come, they will be subject to the same guidance as cast and crew, including, but not limited to symptom screening and/or temperature screening, and PPE requirements.

- Physical distancing and face coverings should be used at all times on set, including in school areas.

- As studio teachers will need to interact with minors within 6 feet of distance, teachers should wear face coverings, practice frequent hand hygiene, and receive training on COVID-19 prevention. Whenever possible, remote schooling should be made available.

- PPE requirements and options may be modified for minors, especially those of tender years. Face coverings are not expected for minors under two years of age.

*Animal Performers*

There is presently no data to suggest that companion animals/pets such as dogs and cats serve as vector for transmission of SARS-CoV-2 to humans.

- Animal handlers/trainers should receive training on COVID-19 prevention and should follow all rules regarding physical distancing and PPE.

- 

---

[3] The parties agree that this means that individuals who have no business purpose for being on set should not visit the set.

- Animals should not be handled by others except those necessary for shooting a scene (i.e., no petting, cuddling, feeding). All those involved in touching animals should perform hand hygiene before and after.

- Other animals not involved in production such as personal pets should be kept off sets.

## UNIQUE PRODUCTION-SPECIFIC CONCERNS – TRANSPORTATION

- Private (i.e., self-drives) or production-provided transportation to and from sets, offices and locations should be prioritized over mass transit/public transportation whenever possible. All drivers and passengers should wear face coverings and maintain social distancing to the extent possible. High-touch surfaces in vehicles shall be cleaned and disinfected frequently throughout the day.

- If neither private nor production-provided transportation is available or reasonably practical under the circumstances, public transportation may be used.

- At all times while in transit, cast and crew should wear face coverings per local public health guidance. Whenever it is reasonably possible to do so, cast and crew shall maintain a distance of at least 6 feet from the driver and other passengers, if any. Upon disembarking, cast and crew should promptly practice hand hygiene.

- If public transportation is used, travel should be arranged to avoid peak travel times, if practical.

## UNIQUE PRODUCTION-SPECIFIC CONCERNS – SPECIAL CONSIDERATIONS FOR TRAVEL

Production travel presents multiple unique circumstances and challenges. Given the changing nature of the COVID-19 pandemic, individual countries are likely to have separate restrictions on travel to and from the United States. Individual states and counties will also have separate restrictions in their jurisdiction. Pandemic "hot spots" may change rapidly, necessitating alterations in plans. Cast and crew traveling for productions should be aware that, should circumstances change in the location, they may be subject to travel restrictions, including enforced quarantine.

- Minimize travel to the extent possible. When travel is necessary, attempt to minimize frequent back-and-forth travel.

- Identify local medical personnel in advance that could assist with care of cast and crew in the event of COVID-19 symptoms.

-

**EXHIBIT 9**

- Production shall monitor local outbreaks and trends, including local public health guidance and restrictions on travel to and from the U.S., and keep cast and crew informed as appropriate.

- Whenever possible, those traveling for productions should not bring family members or other non-essential personnel.

- Air travel shall be booked only on airlines whose policies comply with the Federal Aviation Administration's regulations with respect to COVID-19.

## UNIQUE PRODUCTION-SPECIFIC CONCERNS – SPECIAL CONSIDERATIONS FOR FILMING ON LOCATION

Filming on location can pose certain risks compared with shooting on a studio/stage set. Given the changing epidemiology of COVID-19, particular attention to current public health guidelines and outbreak hotspots is important.

Those responsible for selecting a location should take the following considerations into account.

- Provide adequate space, such as additional trailers, tents and eating space, during location filming to allow for physical distancing.

- Perform wipedown of high-touch areas at least daily.

- Minimize use of crowd scenes or street scenes when a controlled flow of people is not possible.

*Outdoor Locations*

- Prioritize locations where access can be secured and members of the production can be kept away from the general public when possible.

- The location shall provide sufficient space for performing planned production activities while adhering to physical distancing recommendations.

- Prioritize locations with access to hand-washing facilities. Provide ample mobile hand hygiene stations.

- If shooting in inclement weather, provide adequate shelter facilities such as tents to allow physical distancing of cast and crew.

*Indoor Locations*

- Productions should avoid locations that recently have been occupied or used by people who may have been infected with COVID-19, if possible.

-

**EXHIBIT 9**

- If an occupied private home or building location is required for shooting, the occupants should be asked about signs/symptoms of COVID-19 and should vacate the premises for proper cleaning and sanitizing prior to pre-production crew and production cast and crew entering the facility.

- Productions shall select buildings that can be easily and effectively cleaned and that provide sufficient space for performing planned production activities while adhering to physical distancing recommendations.  Locations with hand-washing facilities available should be prioritized.

- Allow adequate ventilation of indoor locations.

*Scouting*

Traditional, in-person location scouting is considered essential to the success of a production. However, given the need for physical distancing and minimizing entry into private spaces, consider alternative options.

- To the extent possible, location teams should pursue alternatives to traditional, in-person location scouting, such as creating virtual options including the use of photographs and digital scouting.

- Tech and director scouting should occur in small groups to the extent possible.

- All departments that provide assessments of scouting locations (environmental hazard assessment, engineering, etc.) as well as the location teams shall be trained in appropriate PPE use and provided sufficient PPE.

- Locations shall be prioritized during scouting that allow complete control of the site, including controlling access, ability to shut down the site for cleaning and high standards of hygiene.

-

**EXHIBIT 9**

## APPENDIX A

The Producers and the IATSE acknowledge that certain principles should guide those who are resuming work in the motion picture industry with COVID-19 present in the community. In particular, advance planning, communication and training, adherence to sound cleaning and hygiene practices (including addressing ventilation and reducing the touching of surfaces), maintaining appropriate physical distancing and the use of personal protective equipment will all contribute to the maintenance of a safe working environment.

While no document can memorialize every practice that may be used to implement these principles safely and effectively, the practices described in this document are intended to provide points of consideration for operating in a safe work environment and are offered as examples of the ways those involved in motion picture production, pre-production and post-production can organize their work environments with these principles in mind. It is important to keep in mind that it may not be appropriate to utilize each and every practice in this document, depending on the circumstances. The COVID-19 Compliance Supervisor will determine in consultation with department heads or departmental operations the health and safety protocols that are necessary and appropriate for work, which may differ from those in this document.

### Advance Planning, Communication and Training

*Implementing advance planning, communication and training:*

- Call sheets should contain contact information for the COVID-19 Compliance Supervisor(s), as well as a mechanism for anonymous reporting.

- Any employee that does not receive a call sheet shall otherwise be notified by the employer of the contact information for the responsible COVID-19 Compliance Supervisor(s), as well as a mechanism for anonymous reporting.

- The Union will be notified in advance when employees are being asked to return to a worksite that was shut down due to an outbreak of COVID-19 and shall be given the opportunity to address any concerns.

*In the Costume Department:*

- In-depth planning should be done in advance of shopping and pulling from rental houses. Delays at rental houses, retail stores, and in shipping items should be anticipated.

- It is desirable for cast to be booked as early as possible so that sizes can be obtained as early as possible.

- Advance planning should be employed to avoid overcrowding in costume and wardrobe areas.

- 

**EXHIBIT 9**

*In the Make-up and Hair Departments:*

- Artists involved in quick changes and continuity re-sets shall plan their touch-up procedures before approaching the performer, including by consulting with the performer.

- Hair and make-up should be planned so as to minimize the amount of time an actor is required to remove PPE.

- Production should schedule make-up/hair tests to avoid overcrowding.

**Cleaning and Hygiene**

*Implementing cleaning and hygiene practices:*

- Companies should provide proper ventilation, with HVAC systems that are regularly inspected and clean filters. Where practicable, the employer shall make reasonable efforts to utilize air filters with a minimum MERV 13 rating, or, in the alternative, implement CDC recommendations on air filtration in buildings.

- After equipment and equipment carts are cleaned, they should be covered when not in use.

- Communal tools and equipment shall be regularly cleaned as appropriate.

- All food prep/styling should occur in a designated and exclusive area, with only necessary personnel having access.

- Any Property Person handling food on set must follow all required food handling hygiene requirements.

- All employees shall have access to a clean and water supply.

- A member of the camera crew should disinfect the eyepiece of a camera or any viewing mechanism before the eyepiece or viewing mechanism is used.

- Headsets, ear-pieces, IFB, hand mics and all communication equipment should be dedicated to a specific person or cleaned prior to a change in users.

- Shared workspaces shall be cleaned prior to each shift of work.

*In the Costume Department:*

- Personal clothing items used as costumes, or personal items of above-the-line personnel should not be prepped (e.g., steamed, ironed, etc.) without first being cleaned, if practical. Background actors who are asked to bring personal clothing to be used on camera must bring clean clothing.
-

**EXHIBIT 9**

- Costumes/outfits of each performer should be separated from those of other performers.

- All wardrobe items must be properly disinfected with appropriate EPA-registered disinfecting methods and supplies with a claim against SARS-CoV-2 before they are provided to a performer; however, items with unique cleaning requirements that cannot be disinfected with such methods or supplies will be cleaned in the customary manner before being provided to the performer.

- When dealing with items likely to be degraded by steam/hot washing, production may "quarantine" the item for an appropriate period of time as an alternative disinfecting method.

- Members of the costume department must have clean hands to handle any costumes, accessories and other items.

*In the Property Department:*

- After a prop has been cleaned and prepared for use by a performer, only members of the property department will touch the item before it is used. If someone who is not a member of the property department touches the item after it has been prepared, it should be cleaned before being used by the performer.

- Set pieces, props and surfaces on which or with which performers are working should be cleaned before and after use.

- Applicable food safety protocols for COVID-19 prevention must be followed when preparing food and beverage items for use on set.

- Stunt department or other appropriate personnel should disinfect stunt mats between users, per manufacturer protocols.

- Members of the property department must have clean hands to handle any costumes, accessories, props and other items.

- Stunt body pads should be assigned for use by a single stunt performer or cleaned before being assigned to another stunt performer.  A stunt performer may choose to bring his/her own stunt body pads for his/her own use on a production.

*In the Make-up and Hair Departments:*

- Special attention shall be given to ensuring proper ventilation in hair and make-up workspaces.

- Schedule time to perform applicable disinfecting protocols between performers.

-

**EXHIBIT 9**

- Wash hands in accordance with CDC-recommended guidelines before and after working on each individual's hair or make-up.

- When practical, professional tools such as brushes and applicators should be assigned to one performer and not used for anyone else. Disposable tools should be utilized whenever possible. After each use, non-disposable hairbrushes, combs and make-up brushes should be cleaned with appropriate disinfecting solutions. All supplies for performers should be kept in individual cast bags.

- A disposable or washable palette for each performer should be used to mix foundation, powders, lipstick, or other compounds.

*In the Make-up and Hair and Sound Departments:*

- Transmitters and lav mics will be disinfected before and after each use.

- Transmitters will be labeled to identify the individual user.

- Lav mounting components that cannot be thoroughly cleaned will be replaced.

**Use of Personal Protective Equipment**

*Examples of practices surrounding the use of personal protective equipment:*

- Employees should label PPE with their name when doing so does not interfere with the efficacy of the PPE.

- Passenger vans should have signs indicating mandatory PPE use.

- Employees shall wear appropriate PPE at all times on the job site, except when eating, drinking or when job duties prevent them from doing so.

*In the Make-up and Hair Departments:*

- Full PPE must be worn by hair and make-up artists at all times while in proximity of performers (i.e., masks and face shields, gloves as appropriate).

**Physical Distancing**

*Examples of the implementation of physical distancing:*

- When individual or rental cars are being utilized, crew members shall not transport other members of the crew, except that crew members may transport other members of the crew who reside with them.

-

- Whenever possible, crew members should maintain the same vehicle seat for the duration of the trip and for any return or subsequent transportation.

- When working in trucks, "bullpen style" offices or other confined spaces, efforts should be made to maintain social distancing. Consider using plexiglass to create individual workspaces, if appropriate.

- When possible, visible physical indicators (e.g., cones, duct tape, signage) shall be placed in areas where employees stand in line to mark six feet of distance.

- Plans for sheltering during inclement weather should be designed to ensure proper social distancing.

- Consider using remote monitoring, remote focus, remote head and other technologies that facilitate operating at a distance.

- Consider using zoom lenses when appropriate to minimize traffic around the camera and to avoid "stacking" when using multiple cameras.

*In the Costume Department:*

- Whenever possible, performers should maintain appropriate physical distancing from other performers and costume staff when receiving a costume or item.

*In the Property Department:*

- Consider whether show-and-tell of a property should be done virtually (e.g., by photos) or at a dedicated table separate from the main property storage area.

-

# ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS

15301 Ventura Boulevard, Building E, Sherman Oaks, CA 91403
Tel: 818.995.3600 • Fax: 818.285.4450 • www.amptp.org

Carol A. Lombardini                                             Direct: 818.935.5930
President                                                      carol@amptp.org

## SIDELETTER

### As of September 21, 2020

David P. White
National Executive Director
SAG-AFTRA
5757 Wilshire Boulevard
Los Angeles, California 90036

Re:    **Group Voiceover/ADR/Looping and Singing and Work in the Presence of Smoke or Other Airborne Particles**

Dear David:

The Producers and SAG-AFTRA (the "parties") have agreed to meet as soon as practicable following the effective date of the temporary "return to work" agreement ("Agreement') to discuss the possibility of additional COVID-19 health and safety protocols for group voiceover/ADR/looping and singing.  The parties have also agreed to discuss additional protocols relating to performers working in the presence of smoke or other airborne particles.  Until such time as the parties have reached an agreement based on those discussions, a Producer signatory to the "return to work" Agreement may engage and/or return individuals to work for group voiceover/ADR/looping and singing or work in the presence of smoke or other airborne particles under the terms and conditions set forth in the "return to work" Agreement.

Sincerely,

Carol A. Lombardini
CAL:vwl

**ACCEPTED AND AGREED:**

By:_____
        David P. White
        on behalf of SAG-AFTRA

**ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS**
15301 Ventura Boulevard, Building E, Sherman Oaks, CA 91403
Tel: 818.995.3600 • Fax: 818.285.4450 • www.amptp.org

Carol A. Lombardini                                           Direct: 818.935.5930
President                                                     carol@.amptp.org

## SIDELETTER

### As of September 21, 2020

Steve Dayan                                    Thomas O'Donnell
Secretary-Treasurer                            President
Studio Transportation Drivers, Local #399      Local #817/I.B.T. Theatrical Drivers and Helpers
P.O. Box 6017                                  127 Cutter Mill Road
North Hollywood, California 91603              Great Neck, New York 11021

Russell Hollander                              David P. White
National Executive Director                    National Executive Director
Directors Guild of America, Inc.               SAG-AFTRA
7920 Sunset Boulevard                          5757 Wilshire Boulevard
Los Angeles, California  90046                 Los Angeles, California 90036

Matthew D. Loeb
International President
International Alliance of Theatrical Stage Employees and
  Moving Picture Technicians, Artists and Allied Crafts
  of the United States, its Territories and Canada
207 West 25th Street, 4th Floor
New York, New York  10001

Re:    **British Columbia - COVID-19 Testing Protocols**

Gentlemen:

During negotiations for a temporary agreement to address return to work issues associated with
COVID-19 (the "Agreement"), the parties agreed that as of August 28, 2020, British Columbia is
a jurisdiction with a low rate of COVID-19 infection, and that the COVID-19 testing protocols in
Item 2.a. of the Agreement may be modified for employees working on certain productions in
British Columbia.  Specifically, the parties agreed to modify the periodic testing protocols in
Item 2.a.ii. for productions that commenced pre-production prior to the effective date of the
Agreement as follows:

(1)    "Zone A" employees who work five (5) or more days in a week need only be
        tested for COVID-19 two (2) times per week.  (The protocols for "Zone A"
        employees who work fewer than five (5) days in a week are unchanged, *i.e.*, they
        need not be tested more frequently than once within the seventy-two (72) hours
        prior to each day of employment.)

(2)

**EXHIBIT 9**

Letter re: British Columbia - Testing Protocols
Page 2
September 21, 2020

      (3)    "Zone C" employees do not require periodic testing after a pre-employment test.

A Producer may contact the Unions to discuss application of these modifications to productions that commence pre-production in British Columbia on or after the effective date of the Agreement under the enabling procedure in Item 1.c. of the Agreement.

Either the Unions, on the one hand, or the AMPTP, on behalf of the Producers, on the other, may notify the other party if either believes, based upon changes in conditions in British Columbia, that these modifications should be discontinued or amended.  The parties shall meet to discuss the matter and any agreement reached by the parties shall be memorialized in a letter agreement.

Sincerely,


Carol A. Lombardini
CAL:vwl

**ACCEPTED AND AGREED:**           **ACCEPTED AND AGREED:**


By:_____    By:_____
    Steve Dayan                          Thomas O'Donnell
    on behalf of the Basic Crafts and      on behalf of Teamsters Local #817
    Teamsters Local #399 Location
    Managers and Casting Directors


**ACCEPTED AND AGREED:**           **ACCEPTED AND AGREED:**


By:_____    By:_____
    Russell Hollander                  David P. White
    on behalf of the DGA               on behalf of SAG-AFTRA

**EXHIBIT 9**

**ACCEPTED AND AGREED:**

By:_____ Matthew D. Loeb
           on behalf of the IATSE

**EXHIBIT 9**